JOHN MATHENY FOR HIMSELF AND OTHERS *v.* WILLIAM GOLDEN, TREASURER OF ATHENS COUNTY.

Where the State, by an act incorporating the Ohio University, vested in that institution two townships of land for the support of the University and instruction of youth, and, in the same act authorized the University to lease said lands for ninety-nine years, renewable forever, and provided that lands thus to be leased, should forever thereafter be exempt from all State taxes. Held :

That the acceptance of such leases at a fixed rent or rate of purchase by the lessees, constitutes a binding contract between the State and the lessees.

A subsequent act of the legislature, levying a State tax on such lands, is a "law impairing the obligation of contracts," within the purview of the 10th section of the 1st article of the constitution of the United States, and is, therefore, pro tanto, null and void.

Where one of the lessees of such lands sues as well for himself as for many other lessees of the same lands, holding on like terms with himself, equity will interpose to prevent multiplicity of suits, and afford a remedy by injunction.

IN chancery. Reserved in the District Court of Athens county.

The case is stated in the opinion of the court.

*S. F. Vinton*, for complainants.

*John E. Hanna*, and the *Attorney General*, for defendant.

BRINKERHOFF, J. This is a bill in chancery, filed in the court of common pleas of Athens county, to which there is a general demurrer. The demurrer having been overruled, and a decree taken for the complainant in the common pleas, the case was appealed by the defendant to the district court of that county, and by that court reserved for decision here on the same state of pleading. The case made by the bill is substantially this :

By two several resolutions of the congress of the United States, passed on the 23d and 27th days of July, 1787, the then board of treasury were authorized and empowered to contract with any person or persons for a grant of a tract of land, in the first of

said resolutions described, lying on the northwest side of the Ohio river, and within the now State of Ohio ; one of the terms of the contract for the grant of said tract to be, that not more than two complete townships should be given perpetually " for the purposes of an university ; " said townships to be laid off by the purchasers of said tracts as near as possible in the center of the first million and a half of acres that said purchasers should pay for, to be applied to the intended objects, by the legislature of the State thereafter to be formed and admitted into the Union, and within the limits of which said tract might be, and which is now the State of Ohio.   Under and by virtue of said resolutions, the board of treasury, on the 27th of October, 1787, entered into a contract with Manasseh Cutler and Winthrop Sargent, as agents for the directors of the Ohio Company of Associates, for the sale of said tracts, and on the terms and conditions prescribed in the said resolutions.

That thereupon the agents of said Company of Associates laid off and appropriated, for the purposes of a university, the whole of the eighth and ninth townships of the fourteenth range of townships in said company's purchase.   That, by authority of an act of congress passed April 21st, 1792, the said tract, including the two townships aforesaid, was, in the same year, patented by the President of the United States to the directors of the Company of Associates, whereby the said two townships of land became and were given and granted perpetually for the purposes of a university.

That the legislature af the State of Ohio, on the 18th day of February, 1804, passed an act, entitled " an act establishing an university in the town of Athens," which, among other things, enacts and declares, that " there shall be an university instituted and established in the town of Athens, in the ninth township of the fourteenth range of townships, within the limits of the tract of land purchased by the Ohio Company of Associates, by the name and style of the ' Ohio University,' for the instruction of youth," etc., a copy of which act is exhibited with, and made part of the bill of complaint.   The said act also provides that there shall be and forever remain in the said university, a body

politic and corporate, by the name and style of the " President and Trustees of the Ohio University ; " that the said two townships, numbered eight and nine, be and are thereby vested in said corporation, for the sole use, benefit, and support, of said university forever ; and the said act, and an act amendatory thereof, passed February 21st, 1805, authorize and enjoin it on said corporation, in the manner, on the terms and conditions, and for the rents therein prescribed, to lease said lands on leases for ninety-nine years, renewable forever ; and, to render said lands as productive as possible to the university, the said act of incorporation further declares, that "*the lands in the two townships appropriated and vested as aforesaid, with the buildings which are or may be erected thereon, shall forever be exempted from all State taxes.*" 2 O. L. 205. That thereupon the said Ohio University was duly organized and put in operation as a body corporate, in accordance with said act, and has so ever since remained. That the complainant is one of the lessees, at a fixed rent, of parcel of said two townships from the university, under the authority of said act of incorporation, and files his bill for himself, and seven hundred and seventy other lessees of other parcels of said two townships, having a common interest in the question involved, with their consent, and by their request. That said exemption from State taxes was a material consideration with him and those on whose behalf he complains, and forms, in fact, a part of said contracts of lease between the lessees and the university.

On the 13th of April, 1852, the legislature of Ohio passed an act, entitled " an act for the assessment and taxation of all property in this State, and for levying taxes thereon, according to its true value in money," which act, among other things, provides that " property, held under a lease for a term of fourteen years, belonging to the State, or to any religious, scientific, or benevolent society or institution, whether incorporated or unincorporated, and school or ministerial lands, shall be considered, for all purposes of taxation, as the property of the person holding the same, and shall be listed as such by such person, or his agent, as in other cases." Swan's Statutes 903. And in the first section of

an amendatory act, passed March 12, 1853 (Swan's Stat. 924), which exempts from taxation certain property of institutions of learning, provides that such exemption " shall not extend to leasehold estates of real property held under the authority of any college or university of learning of this State." The bill finally states in detail that, in pursuance of the acts last before mentioned, a State tax, amounting to over one thousand one hundred dollars, has been assessed on said leasehold estates, and that the defendant, as treasurer of Athens county, is about to proceed to collect the same by distress. There is a prayer for an injunction, and for general relief.

The first question presented here, is, whether, conceding the claim of the complainant and his associates to exemption from State taxes on their leaseholds to be well founded, they can have relief by injunction in a court of equity ? In *The Exchange Bank of Columbus* v. *Hines*, 3 Ohio St. Rep. 1, which was a proceeding to enjoin the collection of a tax alleged to be illegally assessed, it was held by a majority of the court—Ranney, J., dissenting on this point—that relief could not be had in this form, on the ground that a full and adequate remedy was afforded by action at law against the officer who might distrain for the collection of the tax. That, however, was the case of a single party seeking relief for himself alone. And it seems to be well settled, that " where one person claims or defends a right against many ; or where many claim or defend a right against one," courts of equity will interpose in order to prevent multiplicity of suits. 2 Waterman's Eden on Injunctions 415, et seq. Holding, then, as we do, that the complainant, and those for whom he sues, are entitled to a remedy by injunction, if they are entitled to any, we are brought at once to the main questions in the case : does the legislation of our State incorporating the Ohio University, and granting to it the lands originally received from the United States, in trust for the support of such an institution, taken in connection with the lease of such lands at a fixed rent to the complainant and his associates in pursuance of that legislation, constitute a contract ?— and, if so, does the subsequent legislation of the State impair the obligation of that contract ? If it

does; then, under the tenth section of the first article of the constitution of the United States, which declares that "no State shall pass any law impairing the obligation of contracts"—which constitution we have sworn to support, and which Ohio, when she sought to be and was admitted into the Union under it, accepted —that subsequent legislation is *pro tanto* null and void, and the threatened acts of the defendant for the collection of the tax assessed, would be a wrong against which he ought to be enjoined ; if not, not.

In the consideration of these questions, from the course of recent decisions in this State, and the reasonings on which they are based, we are met at the threshold by the inquiry, is the legislature of a State *capable* of contracting ? In so far as the legislature is the representative of the sovereignty of a State, it surely is ; for the capacity to contract is one of the essential attributes of sovereignty. When the congress of 1776 declared the independence of the United States, they proclaimed that "as free and independent States, they had full power to conclude peace, *contract* alliances," " and to do all other acts and things which free and independent States may of right do." To say authoritatively that a State has not power to contract, is to doom her to the incapacities of perpetual minority, indissoluble coverture, or endless lunacy. But, it is said, the constitution of 1802 nowhere grants to the legislature the power to contract. It does not expressly, neither does it to the executive or judicial, the only remaining departments between which the powers of government are distributed. It will not be contended, we presume, that the executive, under that constitution, had any power to contract, aside from legislative authority, nor that he or any other executive officer of the State would be at liberty to refuse to contract in behalf of the State when thereunto specially enjoined by legislative act, unless restrained by some constitutional prohibition. Indeed, in the case of *Plank Road Company* v. *Husted*, 3 Ohio St. Rep. 582–3, which seems to deny to the legislature, under the constitution of 1802, the capacity to contract for the exemption of any property within the State from taxation for any greater length of time than until a subsequent legislature shall

see proper to repeal the act stipulating for, and pledging the faith of the State for the exemption, it is admitted that " contracts to which the State is a party, are usually made under the authority of some existing law " (legislative act), " and in conformity to its directions." Now, contracts are no contracts unless they are binding on the parties to them. If they may be made under the authority of legislative acts, then legislative acts may authorize them. And if the familiar legal maxim be true, that whatsoever a party does by or through the medium of another, as his agent, he does himself, it follows as an inevitable logical necessity that whatsoever a party may of right do by an agent indirectly, he may himself do directly. If, therefore, a legislature may authorize and enjoin the making of a contract by an agent acting solely under and by virtue of its authority, it may itself make the same contract by its own act, without the intervention of an agent.

But it is said the making of contracts is inconsistent in its nature with the functions of legislation, i. e., law-making. This, we respectfully submit, is sacrificing fact to theory, and the substance of things to metaphysical distinctions. That, as a matter of fact, legislatures have made contracts, and have religiously kept them, is susceptible of proof from familiar history ; that they have made them and attempted to break them, the case before us is a deplorable, but by no means a solitary, instance.

The doctrine that legislatures have no capacity to contract, is a novelty in the jurisprudence of Ohio. So far as we know, it was unheard of during the first half century of her existence as a State. Certain it is that the power and legal capacity of the State, through her legislature, to contract, and the binding obligation of contracts thus made, subsequent repugnant legislation to the contrary notwithstanding, was fully recognized and asserted in the year 1835 by the supreme court in bank, in *State of Ohio* v. *Commercial Bank of Cincinnati*, 7 Ohio Rep. 125. The same doctrine was recognized and affirmed in *Fletcher* v. *Peck*, 6 Cranch 127, in the year 1810 ; in *New Jersey* v. *Wilson*, 7 Cranch 164, in the year 1812 ; and so on in an unbroken current of decisions by the Supreme Court of the United States

down to the recent cases of the *State Bank of Ohio* v. *Knoop*, 16 Howard 369, and *Ohio Life Insurance and Trust Co.* v. *Debolt*, 16 Howard 416. So also in *Hardy* v. *The Inhabitants of Waltham*, 7 Pick. 108. In *Ohio Life Insurance and Trust Co.* v. *Debolt*, above referred to, Chief Justice Taney, concurring with the majority of the court in its judgment, which denied to the plaintiff an exemption from taxes which it claimed, on the ground that there had been no contract for such exemption by the State, distinctly admits the competency of the legislature to contract for such exemption; and this on the ground that the power thus to contract is an attribute of State sovereignty never surrendered to the United States, or prohibited to the State by either the State or federal constitutions. He says: " It will be admitted on all hands, that with the exception of the powers surrendered by the constitution of the United States, the people of the several states are absolutely and unconditionally sovereign within their respective territories. It follows that they may impose what taxes they think proper on persons or things within their dominion, and may apportion them according to their discretion and judgment. They may, if they deem it advisable to do so, exempt certain descriptions of property from taxation, and lay the burden of supporting the government elsewhere. And they may do this in the ordinary forms of legislation, *or by contract*, as may seem best to the people of the State. There is nothing in the constitution of the United States to forbid it, nor any authority given to this court to question the right of a State to bind itself by such contracts, whenever it may think proper to make them.

" There are, undoubtedly, fixed and immutable principles of justice, sound policy and public duty, which no State can disregard without serious injury to the community, and to the individual citizens who compose it. And contracts are sometimes incautiously made by States as well as individuals; and franchises, immunities and exemption from public burdens, improvidently granted. But whether such contracts should be made or not, is exclusively for the consideration of the State. *It is the exercise of an undoubted power of sovereignty* which has not been surren-

dered by the adoption of the constitution of the United States, and over which this court has no control. For it can never be maintained in any tribunal in this country that the people of a State, in the exercise of the powers of sovereignty, can be restrained within narrower limits than those fixed by the constitution of the United States, upon the ground that they may make contracts ruinous or injurious to themselves. The principle that they are the best judges of what is for their own interest, is the foundation of our political institutions.

"This power may be indiscreetly and injudiciously exercised. * * * Yet, if the contract was within the scope of the authority conferred by the constitution of the State, it is, like any other contract made by competent authority, binding upon the parties. Nor can the people or their representatives, by any act of theirs afterwards, impair its obligation. When the contract is made, the constitution of the United States acts upon it, and declares that it shall not be impaired, and makes it the duty of this court to carry it into execution.

"This doctrine was recognized in the case of *Billings* v. *The Providence Bank,* and again in the case of *The Charles River Bridge Company.* In both of these cases the court, in the clearest terms, recognized the power of a State legislature to bind the State by contract; and the cases were decided against the corporations, because, according to the rule of construction in such cases, the privilege or exemption claimed had not been granted. But the power to make the contract was not questioned. And I am not aware of any decision in this court calling into question any of the principles maintained in either of these two leading cases. On the contrary, they have since, in the case of *Gordon* v. *Appeal Tax Court,* 3 Howard 133, been directly reäffirmed."

But, it is argued, if a State can bind herself by contract to an exemption of a portion of the property within her limits, and belonging to her citizens, from taxation, the power of taxation being an attribute of sovereignty, she thereby surrenders a portion of her sovereignty, which, in the nature of things, she can not do. Now, this argument overlooks the fact, that the power

to contract is also an attribute of sovereignty; without which a State, so far from being a sovereign, would be on a level of legal incapacity with the minor and the lunatic.   This, I respectfully submit, is the legitimate result of the argument, unless indeed it be (which we will not presume) a flagitious attempt to exonerate a State from the eternal law of right — a law which attaches to Omnipotence Himself, the law of good faith, of justice and of truth.   And to say that a State can bind herself by contract, and yet be at liberty to break it, is a solecism — obligation being a necessary and inseparable incident to every contract.   For a State to bind herself by contract not to tax certain property, then, is not a surrender or abridgment of any portion of her sovereignty; it is simply the exercise of another attribute of sovereignty.   But I deny that a State may not surrender a portion of her sovereignty.   For a good and sufficient consideration, States may do it; States have done it; and the whole line of history is dotted with examples of such surrender.   Great Britain surrendered her sovereignty over this vast empire; France hers over Louisiana; and Mexico hers over California.   They surrendered not only the power of taxation, but every other sovereign power over vast territories.   Ohio, in this case, for a good consideration " to her in hand paid," abdicates the right to tax two townships of land.

Again, it is said that if the State may, by contract, exempt one species or one amount of property from taxation, it may another, and another, and so on, until it is deprived of resources, and thus rendered inadequate to the performance of its proper functions.   That such a catastrophe is, in imagination, supposable, is readily admitted.   The power to contract may be abused. But then this very power of taxation, the ethereal inviolability of which is so strenuously contended for, is liable to similar abuse, and to the same ruinous extent.   It is a fallacy, therefore, to infer the non-existence of a power merely because its exercise may, by theoretical possibility, be pushed to a suicidal extreme. The sovereign power of taxation, and the sovereign power to contract, are both necessary to the proper discharge of the functions of government; but both are liable to abuse.   All governmental

powers are capable of abuse. No frame of political institutions can afford perfect guarantees; and our final reliance must be on the instincts of self-interest and self-preservation, inherent in governments as well as in individuals, and in the provident intelligence of the people, rather than in the judicial declaration of supposed incapacities.

In attempts which have been made to vindicate the recent legislation of the State bearing on the subject of contracts like that we are now considering, it has been *assumed* that the legislature could not by contract bind the State permanently to exempt any given property from taxation; and it is thence argued that this incapacity must have been understood by those who at any time may have contracted with the State; that they therefore contracted in full view of this supposed incapacity — in full view of the impliedly reserved right of any subsequent legislature to annul what its predecessors had done; and that thus the reserved right in one of the parties to alter or annul the contract at pleasure, became and was a part and parcel of the contract itself. Now, this argument is grounded on a subtlety which has never been recognized by the legal profession of our country, and was unknown to the jurisprudence of Ohio for the first half century of its existence; and it seems to us that it would be monstrous to apply it now to those lessees who, from the nature and circumstances of their engagements with the State, it is evident, must have been poor, laborious and unlearned. It would be monstrous to conclude them by holding that they acted in full view of all the contingencies involved in a subtle process of reasoning unknown alike to the profession and courts of the State. Why, look at the argument! It makes words used in stipulations on the part of the State, mean something wholly different from their ordinary acceptation, and wholly different from what the same words mean when employed to express the engagements of the party *contracting with* the State. In the mouth of the lessee, *forever* means *always*. In the mouth of the *State* it means *just so long as I please, and no longer*. Indeed, we have no right to go back and suppose that the parties understood something beside that which appears on the face of their contract; it is but

rational and just to suppose that both parties understood their words to mean just what they said, and that, under the superincumbent and inexorable prohibitions of the constitution of the United States, they were mutually bound to their exact, faithful and perpetual fulfillment. The contrary argument is redolent with the odor of repudiation; is rife with the very mischief which it was the special design of the tenth section of the first article of the constitution of the United States to prevent; is condemned by the morality of the world, and can find, we trust, no durable resting place in courts of justice.

Again, this recent legislation is attempted to be justified by an argument drawn in some way—we confess to us not very intelligible—from the fact that, since the making of the contract set forth in the bill, the State has effected a peaceable revolution; or in other words, changed its constitution, and that the statutes complained of are in conformity to the express requirements of that constitution. Now, granting, for the sake of the argument, that the facts are as claimed; let us inquire : Does a change of constitution annul contracts? Does a revolution, whether peaceful or violent, justify or excuse repudiation? Certainly not. Were the United States less bound for the faithful payment of their debts, contracted to the government of France and the bankers of Amsterdam during the war of the revolution, on account of the substitution of the present constitution of the United States, for the old articles of confederation? Has France any more or better right to resume the power of taxation, or any other sovereign power over Louisiana, in the face of her solemn contract to the contrary, from the fact that her brilliant but volatile people have, since that time, seen proper to change her constitution with every changing moon ? If she were to attempt it, the law of nations—the code of international morality, sanctioned and enforced by the general conscience of Christendom—would denounce the just penalty of war against her. And is the obligation of a contract less sacred, because one of the parties to it is an humble individual, incapable of vindicating himself with a strong hand ? In the case before us, no penalty accrues, no war results ; and yet injustice is allowed. The constitution of the United States inter-

poses its potent veto, avoids the very act of repudiation, and leaves the obligations of the contract unimpaired.

To frame a new State constitution is but to " pass a law "—a law more formal and solemn in the mode of its enactment, to be sure, and passing under the more direct supervision of the constituent body, the people—but still a law, and like any other law, subject to the supremacy of the constitution of the United States, and a nullity when in conflict with the provisions of that instrument.

By the constitution of 1802, it is enjoined on the legislature " forever to encourage by legislative provision, schools and the means of instruction." No such duty is by that constitution enjoined on the legislature in respect to internal navigation and the facilities of transportation. Yet the legislature under that constitution did inaugurate and prosecute the policy of constructing canals radiating into almost every quarter of the State. In so doing, it contracted an enormous debt, the burthens of which are now not only known, but felt. Having no other assured resource for the discharge of this debt but that of taxation, it thereby, in effect, virtually bound itself to tax its people perpetually until this debt should be finally paid. This obligation has ever been scrupulously observed. The first dawnings of a desire to repudiate it were at once and forever frowned out of countenance. All recognize—no one disputes—the obligation.

Now, if a State may by contract bind herself *to tax* for the promotion of a policy not of constitutional obligation, may she not in like manner bind herself *not to tax* for the promotion of a policy which *is* of constitutional obligation ?

Here, then, were parties competent to contract; for no one will question the competency in this respect of the complainant and those for whom he sues. Did these parties agree ? did their minds meet ? What are the facts ? The State opens the negotiation, and, speaking through her legislative act, makes her proposition to the complainant and his associates to this effect : If you will lease these lands at a fixed rent, payable to the Ohio University, for ninety-nine years, your lands thus leased shall be perpetually exempt from all State taxes. This is the proposition

of the State.  The complainant and his associates lease the lands accordingly ; they bind themselves to pay, have paid, and must continue to pay, a fixed rent accordingly; a rent fixed, as a matter of course, at a considerably higher rate than they would have been willing to pay had it not been for the proposed exemption. Relying on the faith of the State for the fulfillment by her of a contract based on her own proposition, they take leases ; and thus accept the proposition of the State pure and simple, without modification ; and thus the minds of the parties have met.  They have respectively agreed to do particular things, and not to do other particular things.

Was there a good and valid consideration ?  To promote and secure the instruction of her youth, may properly be said to have been the primeval, as it is the fundamental and favorite policy of Ohio.  This policy originated with the congress of the old confederation, is indicated in the resolutions of that body authorizing the first sale of lands within the limits of our State to the Ohio Company of Associates, and was provided for in the contract of sale between the board of treasury and the agents of that company, while the State was still in embryo.  In the constitution of 1802, the first organic law of the State, it is declared that " religion, morality, and knowledge, being essentially necessary to good government and the happiness of mankind, schools and the means of instruction shall forever be encouraged by legislative provision, not inconsistent with the rights of conscience."  Our present constitution declares that " the general assembly shall make such provision, by taxation or otherwise, as    *    *    will secure a thorough and efficient system of common schools throughout the State."  And this very year the State is levying a tax for educational purposes alone, amounting in the aggregate to not less than one million two hundred thousand dollars.

In the payment by these lessees, then, of a larger rent, in faith of the promised exemption, than they otherwise would have been willing to pay, to be paid to the Ohio University, the trustee of the State, and the creature of her legislation, in trust for the promotion of her wise and favorite policy, we find an adequate and

valuable consideration for the exemption proposed by the State, and accepted as a material part of the contract by the lessees.

Here, then, we have parties competent to contract; a meeting of minds, and mutual agreements to do and not to do particular things; and finally a good and valid consideration; and thus there is filled, in every particular, the legal definition of a binding contract.

Contracts stipulating for exemptions of this kind are not favored in law, and will never be presumed. *Charles River Bridge* v. *Warren Bridge*, 11 Peters 420; Taney, C. J., in *Ohio Life Ins. & Trust Co.* v. *Debolt*, 16 How. 435. And, as an individual member of this court, and speaking for myself alone, I am free to say that I am very far from being friendly to the policy of such exemptions, and am gratified that our present constitution has effectually prohibited the grant of them in future. But the question of constitutional and legislative policy is one thing, and the questions of law and fact now before us are other and very different things. That here was a contract perfect in all its requisites, is clear; the language and conduct of the parties is unequivocal, admits of but one interpretation, and leaves no room for presumptions.

Is the recent legislation of the State such as to impair the obligation of this contract? The question, unfortunately, can have but one answer. It has attempted to tax lands which it had solemnly contracted never to tax. Perhaps we ought to presume—and we should certainly be very glad to be able to presume—that this recent legislation complained of was the result of oversight. But—and we feel neither pride nor pleasure in saying it—the language of that legislation seems to be too explicit, and too direct in its application to these lands, to admit of so charitable a presumption.

An argument has been attempted to be drawn in justification of these acts of seeming repudiation, from supposed analogies between the right of taxation and the right of eminent domain. But there are no such analogies; and if there were, they would not apply to the case before us. The right of eminent domain rests on the basis of supposed imperious necessity, and is insepa-

rable from an obligation resting on the State to make compensation for the property appropriated under it. Woodbury, J., in *West River Bridge* v. *Dix*, 6 Howard 545. If the right of taxation and the right of eminent domain ·are analogous, then their incidents ought to be analogous ; and it will hardly be contended that the right of taxation rests on any such basis, or involves any such incident. At all events, here is no pretense of necessity, and no provision for compensation. Indeed, the idea of compensation to the individual for taxes exacted, is an absurdity ; as all motive for the tax itself would thereby cease. It is enough, however, for us to be clear that the legislation complained of is in contravention of the constitution of the United States, and being so, is therefore null and void. In justice to my own estimate of the character of our people, I will take the liberty to say, I am satisfied that their " sober second thought " will never sanction that legislation ; and that, could the question be brought fairly and fully before them, they would, without reference to the provisions of the federal constitution, recoil from such a seeming manifestation of Carthagenian faith, with the same abhorrence as that which animated the framers of the constitutional prohibition we are called on to apply.

In passing upon the grave questions involved in this case, and in the exercise of the high functions to which official duty compels us, we have not been insensible of the delicacy and responsibility of our position. But we have sworn to support the constitution of the United States ; and, so far as depends on us, its guaranties must be upheld and the faith of contracts preserved inviolate.

*Decree for complainant, and those for whom he sues.*

BARTLEY, C. J., dissented.

*Syllabus of the leading points in the dissenting opinion, as noted by the Chief Justice:*

According to the interpretation of the clause in the tenth section of the first article of the constitution of the United States, prohibiting any State from passing any law impairing the obligation of contracts, by Chief Justice Marshall, the term *contract*, as used in the constitution, was never intended to extend to the civil relations of persons, or to restrain the legislation of the States in regard to their civil institutions.

The *franchise* of a corporation is not *private property*, and cannot be made the *subject matter* of *contract* within the meaning of the above mentioned clause of the constitution.

A *legislative exemption from taxation* in the charter of a corporation, cannot be construed to be a *contract* within the meaning of this constitutional prohibition.

The *power of taxation, and the power of amending and repealing* existing laws, are essential functions of the sovereign authority of the State, a *surrender* or *abridgment* of which cannot be made the *subject matter* of contract.

The delegated *legislative power* of the State, including the power of taxation, as well as the power of altering and repealing existing laws, must remain perfect and complete in the General Assembly as a continuing body at every session. And one legislature cannot, by the authority of the constitution, in the enactment of laws, provide by contract against their amendment or repeal by a subsequent legislature.

Every statute being subject to the *implied* and *inherent condition* of its liability to alteration and repeal, if a statute, conferring the franchise of a corporation, could constitute a contract, within the meaning of the constitutional prohibition, such contract would be subject to the *implied* and *unavoidable condition* that it might be altered or repealed, in the exercise of the legislative power.

By the adoption of the new constitution, the people of this State, in the exercise of their original sovereignty, resumed the power of taxation (if it had been, to any extent, impaired by legislative relinquishment), by the express provision in the constitution, requiring taxation to be by an equal and uniform rule on all property in the State.

Where lands are donated by the government, and the legal title vested in an incorporated institution of learning for the purpose of endowing it, and authority is given to the corporation to lease the lands on a specified or fixed rent, and to require, at discretion, an *additional yearly rent not exceeding the amount of taxes which the State imposes on property of like description*, a provision in the law incorporating the institution exempting the lands, "*as appropriated and vested in the corporation*, from all State taxes," is a simple exemption of the interest of the institution in the lands from taxation, and not that of the lessees of the lands; and by no known rule of interpretation can such an exemption create any privity of contract, between the State and the lessees, for a surrender of the power of taxation.

## Bartley, C. J., dissenting:

The intrinsic importance of the principle involved in the decision just announced, and its effect upon the law as settled by repeated adjudications of this court, from an early period after its organization, forbid that I should withhold a full and explicit statement of my solemn convictions touching the grounds of my dissent, with the reasons upon which they are based. The de-

cision involves a grave constitutional question which touches the foundation of all civil authority, and rises far above any consideration of mere temporary interests, or immediate bearings in this case. It announces a principle, which creates perpetuities in exemptions from the equal burdens of taxation, which may extend not only to millions, but hundreds of millions of dollars worth of property, and gives to those perpetuities not only a permanency paramount to the constitution of the State, but a superiority over the prerogative of the sovereignty of the people.

The question of the policy of the State to foster institutions of learning, and to encourage the cause of education, is not in controversy. That is a matter about which we would not probably differ.

It is contended on the part of the plaintiff, that the provision of the tax law of 1852, imposing a State tax on the lands of the Ohio University at Athens, is unconstitutional and void, so far as it affects the provision of a prior statute exempting the lands of the university from the payment of any State tax, by virtue of the prohibitory clause of the 10th section of the first article of the constitution of the United States, which declares that "*no State shall pass any law impairing the obligations of contracts.*" I propose to consider the question in two points of view.

I. I maintain that the circumstances of the case presented by the plaintiffs, do not constitute a contract within the operation of this prohibitory clause of the constitution.

II. If it be conceded, even for the sake of the argument, that such a contract does exist, the provision of the tax law does not violate its terms or impair its obligations.

I will consider these in their order.

I. That which is set up as constituting the contract, the obligation of which is alleged to have been interfered with, consists of a statutory provision exempting the lands of the university from the payment of any State tax. The circumstances connected with the legislative exemption are as follows : In the year 1792, the United States, in the grant of the lands pur-

chased by the Ohio land company, reserved, within the territory granted, two townships of land for the purpose of endowing a university ; and by resolution of congress, the legislature of Ohio was entrusted with the application of the fund to the purposes of the donation.   In 1804, the legislature passed an act incorporating the Ohio University, in the town of Athens, and vesting the lands of the two reserved townships, in the corporation, in trust for the use and support of the university.   The same statute provided for a valuation of the lands in their original and unimproved state, and authorized the corporation to lease the same for the term of ninety-nine years, renewable forever, on the yearly rent of six per centum on the amount of the valuation. Provision was also made for a re-valuation at the expiration of thirty-five years, and another at the expiration of sixty years from the commencement of the term of each lease, to be made on the principle of the first valuation ; and for the payment of a rent of six per centum per annum on the re-valuation.   And besides the fixed rent, a provision was made as follows :

" *Provided, always, that the said corporation shall have power to demand a further yearly rent on said lands and tenements, not exceeding the amount of the tax imposed on property of like description by the State.*"

It was also further provided, in the same act, " *that the lands in the two townships* APPROPRIATED AND VESTED AS AFORESAID, *with the buildings which are or may be erected thereon, shall forever be exempted from all State taxes.*"

Now, the suit before us is brought, not by the university, to enforce any contract-arrangement between the corporation and the State, but by the plaintiff, in behalf of himself and others, as the lessees of the university lands.   And it is not pretended by the plaintiff, that the lease or instrument executed between the corporation and the lessee, as evidence of the lease-hold estate, contains any *express condition* or *stipulation* that the land shall be exempt from State taxes.   But it is claimed that the legislative exemption, just recited from the act of 1804, constitutes a contract on the part of the State, that the lands donated to the

university, should be forever exempt from the payment of any State tax in the hands of the lessees. And the real question presented, is, whether this legislative enactment is to be regarded as a *law* prescribing a *rule* in relation to taxation, or a *contract* stipulating against the imposition of a State tax on the lease-hold interest of the lessees—a *legislative command,* or a *contract* between the State and the lessees.

A *law* is a rule of action prescribed by the supreme power of the State, enacted in view of the overruling considerations of the public interests. A *contract* is an engagement entered into between *two competent parties,* in relation to something which is *a competent subject matter of contract,* upon a mutual legal consideration, and with a mutuality of obligation. If this provision of the law be a contract, who are the parties to it ? The provision is an immunity conferred on the university, with a view to its benefit. The corporation is the beneficiary of the donation. The relation of donor and donee was between the United States and the university. The State legislature was used as an instrumentality in vesting the donation in the university. The legal title to the land was vested in the corporation, and the authority of disposing of the land by lease belonged to the corporation alone. The contract creating the relation of lessor and lessee, was a contract to which the corporation and the lessee were *the parties.* The State was not a party to the lease. The lessee obtained his lease by an express written contract with the university, and not by any contract or negotiation with the State, or any grant made by the State to him. There was no privity of contract between the State and the lessee. He neither paid, nor agreed to pay, anything to the State. The consideration for the lease was the obligation of the lessee to pay to the corporation the specified rent. If, by the legislative act, a proposition on the part of the State was made to any person, it was to the corporators or corporation, and not to the lessees. The grant of the corporate franchise was to the corporators, and that of the donation of the lands was to the corporation. The corporators accepted the franchise, and the corporation accepted the lands on the terms of the donation. It was the corporation, and

not the State, that made the proposition to the lessees; and they accepted their leases from the corporation as the lessor, and not from the State. Suppose a breach of the contract on the part of a lessee; could the State have any remedy by suit on the contract? What would be the form of the remedy? and what the form of the relief? The liability of a lessee for a breach of his contract, would be manifestly to the corporation, and not to the State. The idea, therefore, that the legislative exemption from taxation, constituted a contract between the State and each lessee, appears to me to be wholly inconsistent with the facts, and simply preposterous.

True it is, the contract between the corporation and the lessee was made in view of the provisions of the law authorizing the contract, and in one sense may be said to comprehend its terms. All contracts are held to be made in contemplation of the existing laws relating to their subject matter. And the proposition that whenever the State has, by legislative enactment, made regulations in relation to any particular subject matter, that the State, by means thereof, becomes a party to every contract between individuals, or private persons, in regard to such subject matter, would hardly be seriously claimed by any one.

If the exemption of the lands from taxation constituted a condition or stipulation on the part of the corporation, in the contract on which the lease was taken, and as a consideration, or part consideration for the undertaking of the lessee, it would be binding on the corporation as such, and for any breach of it, the corporation would be responsible to the lessee. As *such*, it would have the effect of a stipulation on the part of the corporation to keep the lessee clear of any assessment of State taxes upon the lands leased, and in case of the repeal of the exemption, and the assessment of the tax, the lessee might enforce the contract against the corporation by way of indemnity, and require a *pro tanto* reduction on the annual rent, which the corporation had a right, under the contract, to collect. The obligations of the contracts, therefore, between the corporation and the lessees, would not have been impaired, for they might have been enforced by the lessees against the corporation.

The exemption provided by the statute is either simply a rule in regard to taxation, or it is a contract between the State and the corporation. If it be a simple statutory regulation in regard to taxation, it was liable to repeal by any future legislature, and, therefore, did not authorize the corporation to contract with the lessees, that they should be forever exempt from this tax. And had the corporation made a special stipulation with the lessees for a *perpetual* exemption of the lands from taxation, without authority to do so, it clearly could not have bound the State. The legislature, however, in the same statute which provided for the exemption, exercised a prudent foresight as to a future change of policy in this regard, by providing, " *always*," as a condition on which the lands might be leased, " that the corporation should have *power to demand a further yearly rent on said lands and tenements, not exceeding the amount of the tax imposed on property of like description by the State*." Why this provision allowing the corporation to exact a further rent, in addition to the six per cent. on the valuation of the lands ? And why is the amount of the tax, which the State might from year to year assess on property of the same kind, made the standard or limit for this additional tax ? It manifests the clear intention of the law to be, that the exemption from taxation should enure to the benefit of the university, instead of that of the lessees. This provision authorizing the university to require a further and additional annual rent, is in the same law with the provision exempting the lands from taxation ; and each must be construed with reference to the other, and the one, as much as the other, was embraced in the terms and conditions of the lease. If, by the terms of the lease, the lands were exempt from State taxes, by the very same terms they were liable to an additional rent equal to the tax, which additional rent the university was always at liberty to require. So that, as to the interest of the lessee, it could make no kind of difference whether the university should require this additional rent, or the State should require of him the payment of the tax, being precisely the same in amount. And, whether the lessees paid the amount as a State tax, or as an additional rent, could make no difference as to the interest of the lessee, except

as a mere matter of form. And, if the State should in future tax these lands as the property of the university, the corporation need not be deprived of any portion of the regular fixed rent of six per cent. on the lands, as it had the right to require of the lessees the additional rent equal to the tax. If the State should tax the lands as the property of the lessees instead of that of the university, and the university at the same time omit to require any of this additional rent, the lessees would not be required to pay on their lands a single cent more, than the express terms of the lease allowed to be exacted in the form of rent. If the university should require the additional rent, and the State at the same time require the lands to be taxed in the hands of the lessees, the latter, by the terms of the contract, could compel the university to make a *pro tanto* reduction on the rent, equal to the utmost extent of the additional rent. Wherein, then, is the lessee injured, and how is the obligation of his contract impaired? It is not averred or pretended, on the part of the plaintiff in this case (the lessee), that he has been required to pay the additional rent, and also the State tax. If such were the ground of the complaint, his only remedy would be on his contract with the university, in which he could compel a reduction on the additional rent required of him. The exemption from taxation, here, could not attach as an incident to the land. The most that can be claimed, is, that it is an immunity for the benefit of the university. And if it be in the nature of a contract at all, it can be *such* only as between the State and the university. This is manifest from the language of the exemption itself. The statute appropriates the lands, and vests them in the university; and provides that *the lands " appropriated and vested as aforesaid "* shall be exempted, etc. The exemption applies to the lands as the property of the university alone. It is the university, and not the lessees, which is entitled to the benefit of the exemption.

With all proper deference for the opinion of the majority of the court, therefore, I must be permitted to say, that, by the plain interpretation of the law, its true intent is, to my mind, so manifest as to be without doubt or difficulty. As the federal government had made this liberal donation of lands, to aid the cause of

education, the legislature desired, by an act of munificence on the part of the State, to aid the institution of learning, by an exemption from the burden of State taxation. And the language of perpetuity used in making this legislative exemption, in the act of 1804, manifests the desire of that legislature, that the exemption should not be repealed by a future legislature. And, to effectuate this intention as far as practicable, and secure this immunity to the university, the provision was inserted authorizing the corporation to require the further and additional rent limited to the amount of the tax; so that, in case the State should in future impose a tax upon the interest of the university in the lands, the corporation could protect itself by requiring an additional rent from the lessees, equal to the amount of the tax. And, in case the State should impose the tax on the lessees, and they should come back on the university for a *pro tanto* reduction on the fixed rent, the corporation had full protection against the burden, by requiring of the lessees the additional rent equal to the amount of the tax. Thus, if the policy of the State should be changed, and the tax be imposed by some future legislature, the burden would fall on the lessees, and not on the institution of learning. This is the only rational explanation of the fact, that the additional rent authorized is limited to the shifting and variable rule of a State tax.

But it is said that the plaintiff, and the others on whose behalf he sues, are "*poor, laborious, and unlearned,*" and weight is given to this circumstance in giving an interpretation of the statute. It is not averred in the petition, nor does it appear in the proof, that the lessees are such. If, however, from the relation of lessor and lessee, the court is bound to act on the assumption that the lessees are not only "*poor and laborious,*" but also "*unlearned*" men, does it follow that the great maxim of the law, matured and sanctioned by the wisdom of ages—"*Ignorantia juris, quod quisque scire tenetur, neminem excusat,*" is to be set aside? Is the determination of a grave legal question, in the court of dernier resort, to be affected by the consideration of a party's condition in life, habits of industry, or degree of intelligence? By what standard shall the degree of a man's poverty,

intelligence, or habits of industry be tested, in determining his rights, or giving effect to his contracts ?

I humbly conceive, that there is but little actual necessity for invoking the aid of sympathy in behalf of the lessees of the Ohio University lands, in the interpretation of a statute ; for the tendency of the legislation of the State brought under review in this case, is to show the fact that the lessees have been special objects of legislative favor. Besides the statute of 1826 in relation to the surrender of leases, and numerous other acts passed for the benefit of the lessees ; when an attempt was made in 1841 to inforce the re-valuation provision in the contract of the leases, it was resisted by the lessees on the alleged ground that the condition of re-valuation had been abrogated by implication, in the amendatory statute of 1805, relating to this institution. The Supreme Court, however, otherwise determined in the case of *Mc Vey* v. *The Ohio University*, 11 Ohio Rep. 134. After this, on the application of the lessees to the legislature, the statute of 1843 was enacted, releasing the lessees from the condition of re-valuation, *without the consent, and against the interest of the university.*

The *real* question, however, in this case, and that which is mainly urged by the learned counsel on behalf of the plaintiff, is, whether the law incorporating the university and including the exemption from taxation, constitutes a contract between the State and the incorporation, within the operation of the tenth section of the first article of the constitution of the United States. And this question, narrowed down to the limits of this case, and stripped of all disguises in modes and forms of expression, is nothing more nor less than this : whether the *sovereign power of taxation* inherent in the people of the State, can be, and was in this instance abridged, or to any extent surrendered, by the legislative exemption from taxation in the charter of the university ; so as to be beyond not only the authority of the legislature to resume it at any future session, but also beyond the power of resumption or change in the people of the State themselves, in the exercise of their original authority of remodeling, reforming and recon-

structing their institutions by the formation of a new constitution. It is not claimed that an ordinary statutory provision, exempting any specified property from taxation upon grounds of public policy, is in the nature of a contract. But it is insisted, that this exemption is embraced in the terms of the charter of the university, and as such, one of the conditions on which the corporators accepted the franchise. So that the plaintiff founds his whole case upon the doctrine, that the charter of a private corporation is a contract.

In the legal opinion, which has passed current as law taken for granted in this country, for a number of years, there has been a very loose and indefinite conception of the real scope and effect of the doctrine, that the charter of a corporation is a contract. What is the *true import* of this doctrine ? It is not claimed, that the contract consists in the investments in the stock of the corporation. These arise out of contracts between the stockholders and the corporation, to which, it is not pretended, that the State is in anywise a party. Neither is it pretended, that the contract arises out of the dealings of the corporation in the course of its business with persons other than the stockholders. On the contrary, the claim is, that the franchise of the corporation is the subject matter of the contract ; and that the contract is between the State on the one part, and either the corporators or the corporation on the other part. (See opinions of Judges Story and Washington, in *Dartmouth College* v. *Woodward*, 4 Wheat.)

It is not even pretended, that the question is affected by rights acquired by investments in the stock of the corporation, or by contracts made in the course of its business. In *Mumma* v. *The Potomac Company*, 8 Pet. Rep., Mr. Justice Story has explained this subject, in the opinion of the court, to the effect that as a corporation, by the very terms and nature of its political existence, is liable to dissolution in various ways, and upon various grounds, every person who deals with the corporation must be presumed to contract in contemplation of the nature and incidents of such a body politic ; that the dissolution of the corporation connot, in any just sense, be considered an impairing of the obligations of the contracts of the company with other persons,

any more than the death of a natural person may be said to impair the obligations of his contracts ; and that the obligations of such contracts survive, and that the creditors may enforce their claims against any property belonging to the corporation, at the time of its dissolution, which is treated as being held in trust for the creditors and stockholders.

It is well settled, that a State law cannot be declared void under this prohibitory clause of the constitution of the United States, on the ground that it divests antecedent vested rights of property. In the case of the *Charles River Bridge* v. *Warren Bridge,* 11 Pet. Rep. 539, Chief Justice Taney, delivering the opinion of the court, said :

" It is well settled by the decisions of this court, that a State law may be retrospective in its character, and may divest vested rights, and yet not violate the constitution of the United States, unless it also impairs the obligations of a contract. In 2 Peters 413, *Satterlee* v. *Mathewson,* this court, in speaking of the State law then before them, and interpreting the article in the constitution of the United States, which forbids the States to pass laws impairing the obligations of contracts, uses the following language : ' It (the State law) is said to be retrospective ; be it so. But retrospective laws that do not impair the obligation of contracts, or partake of the character of *ex post facto* laws, are not condemned or forbidden by any part of that instrument,' (the constitution of the United States.) And in another passage in the same case, the court say : " The objection, however, most pressed upon the court, and relied upon by counsel for the plaintiff in error, was, that the effect of this act, was to divest rights which were vested by law in Satterlee. There is certainly no part of the constitution of the United States which applies to a State law of this description ; nor are we aware of the decision of this, or any circuit court, which has condemned such a law, upon this ground, provided its effect be not to impair the obligation of a contract.' The same principles were re-affirmed in this court in the last case of *Watson et al.* v. *Mercer,* decided in 1834, 8 Pet. 110 ; as to the first point, (say the court) it is clear that this court has no right to pronounce an act of the State legislature void, as contrary to the constitution of the United States from the mere fact that it divests antecedent vested rights of property."

It is not the impairing or divesting of vested rights of property which is the subject of complaint, and protection from which is sought, but the impairing or destroying the obligations of contracts. This distinction is important to an accurate understanding of the subject. By the repeal of the charter of a corporation,

neither the obligations of the contracts, on which the stockholders hold their stock, nor those of others' contracts made in the course of the business of the corporation, are destroyed. On the contrary, after such repeal, they may still be enforced against the property of the corporation to the utmost extent of its means, as has just been shown by the opinion of the supreme court of the United States, by Mr. Justice Story ; and this is all that could have been reached, even had the corporation been still in existence. The corporators, or other persons having the possession of the property of a defunct corporation, are held liable as trustees of the property for the benefit of the creditors of the corporation. All that the corporators lose by the repeal, is their corporate capacity, or power to carry on their business as an artificial person, and any exclusive privileges appertaining thereto. And after the corporate franchise shall have been taken away, the corporators may use their capital stock as a joint stock association, to carry on any business not prohibited to the community at large. And it is undeniable, that the obligations of contracts made with *municipal corporations* in the course of their business, the repeal of the charters of which is admitted to be within the legislative power, would be liable to be affected as much, if not more, by the abrogation of the corporate franchise, than those of contracts with private corporations, by such event.

The question under consideration is in no wise affected by the principle, which prevails in case of rights acquired by ordinary contracts with, or conveyances of property by the State, under and pursuant to the authority of a law. In such cases, the simple repeal of the law leaves the contracts already made in full force, and does not divest rights thus already vested. See *Toledo Bank* v. *Bond,* 1 Ohio St. Rep. 641. But the doctrine, that the charter of a private corporation is a contract, rests upon the idea, not of a contract distinct from the law, nor of a contract made under the authority of a law, but that *the law itself conferring the corporate franchise constitutes a contract,* the terms of which are not only expressed and embodied, but also inherent in the provisions of the law itself, and therefore impaired by its alteration or repeal. The claim is, that the corporate fran-

chise is the *subject matter* of contract, and it never has been seriously pretended, in any adjudicated case, that a franchise could exist independent of the law, or charter granting it.

That the public relation created by the franchise of a corporation imposes obligations on the State, is readily conceded ; and the term contract, in its most extended signification, might be construed as comprehending this, and many of the other public relations between the citizens and the government, arising out of the civil institutions of the State.  But it is manifest that the term *contract*, in the prohibitory clause of the tenth section of the first article of the constitution of the United States, is to be taken in a more restricted sense, and not as applying to the public relations created by the civil institutions of the State.  I adopt, to the full extent, the interpretation of this provision of the constitution, given by Chief Justice Marshall, in delivering the opinion of the court in the case of the *Dartmouth College* v. *Woodward*, 4 Wheat. 627, which is in the following words :

" It has been argued, that the word ' contract,' in its broadest sense, would comprehend the political relations between the government and its citizens ; would extend to offices held within a State for State purposes, and to many of those laws concerning civil institutions, which must change with circumstances, and be modified by ordinary legislation ; which deeply concerned the public, and which, to preserve good government, the public judgment must control. That even marriage is a contract, and its obligations are effected by the laws respecting divorces.  That the clause in the constitution, if construed in its greatest latitude, would prohibit these laws.  Taken in its broad, unlimited sense, the clause would be an unprofitable and vexatious interference with the internal concerns of a State, would unnecessarily and unwisely embarrass its legislation, and render immutable those civil institutions which are established for purposes of internal government, and which, to subserve those purposes, ought to vary with varying circumstances.  That as the framers of the constitution could never have intended to insert in that instrument a provision so unnecessary, so mischievous, and so repugnant to its general spirit, the term ' contract,' must be understood in a more limited sense.  That it must be understood as intended to guard against a power of at least doubtful utility, the abuse of which had been extensively felt; and to restrain the legislature in future from violating the right to property.  That anterior to the formation of the constitution, a course of legislation had prevailed in many, if not in all of the States, which weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful perform-

ance of engagements. To correct this mischief, by restraining the power which produced it, the State legislatures were forbidden ' to pass any laws impairing the obligations of contracts,' that is, of contracts respecting property, under which some individual could claim a right to something beneficial to himself; and that since the clause in the constitution must, in construction, receive some limitation, it may be confined, and ought to be confined, to cases of this description; to cases within the mischief it was intended to remedy. ·

" The general correctness of these observations cannot be controverted. That the framers of the constitution did not intend to restrain the States in the regulation of their civil institutions, adopted for internal government; and that the instrument they have given us is not to be so construed, may be admitted."

Again: Chief Justice Marshall adds, in reference to the rights claimed in behalf of the corporation, on page 644, of same opinion:

" It is more than possible, that the preservation of rights of this description was not particularly in the views of the framers of the constitution when the clause under consideration was introduced into that instrument. It is probable, that interferences of more frequent occurrence, to which the temptation was stronger, and of which the mischief was more extensive, constituted the great motive for imposing this restriction on the State legislatures."

This is the explanation of the constitutional provision in question, given by Chief Justice Marshall, at an early day. And it should not be perverted by the prevalent misapprehension of the true ground of the decision, by the majority of the court, in the *Dartmouth College Case.* In that case, the effect of the State law was to take extensive donations of private property from the hands of one corporation, in which it had been vested by the contract of the donors, and transfer it to the possession and control of another corporation, under different regulations. And Chief Justice Marshall does not, by any language whatsoever, place the decision on the ground that the mere charter and civil immunities of the corporation constituted a contract. (See *Toledo Bank* v. *Bond*, 1 Ohio St. Rep. 670.)

From this interpretation of the constitution of the United States, by Chief Justice Marshall, it appears:

1st. That the evil intended to be provided against by this constitutional restraint, was a course of legislation which had pre-

vailed in the States anterior to the formation of the constitution, which had weakened the confidence of man in man, and embarrassed all transactions between individuals, by dispensing with a faithful performance of *contracts of the ordinary character.* And,

2d. That the term ' contract,' as used in the constitution, does not comprehend the political relations between the government and its citizens, nor extend to the laws concerning.the civil institutions of the State; on the contrary, that the framers of the constitution did not intend by this provision to restrain the States in the regulation of their civil institutions.

We have here, in clear and explicit language, the sense in which the framers of the. constitution employed the term "contract," in this provision; the circumstances under which.it was inserted in the constitution; the mischief designed to be guarded against, and the opinion of the Supreme Court of the United States, by Chief Justice Marshall, that the provision was never intended by the framers of the constitution, to extend to grants of civil authority, and privileges, or to restrict the legislation of the States in regard to their civil institutions, established from motives of public policy. And it is fair to conclude, that if the framers of the constitution had intended this restraint to extend to the civil institutions of the States, and grants of civil authority or special immunities, that language would have been employed, which, in its ordinary signification, would have been clearly understood to express it.

Now, as a corporation, established as it is by the authority of law, and from considerations of public policy, is undeniably a civil institution of the State, this interpretation of the constitution, by one of its most illustrious expounders, would seem to be conclusive, that the charter of a corporation is not a contract within the operation of this constitutional restriction.

There are numerous other relations arising from the civil regulations and institutions of the State, creating obligations bearing fully as strong, and some of them, a much stronger resemblance to a contract in its ordinary sense, than the charter of a corpora-

tion, and which, it is conceded, do not fall within the scope and operation of this restrictive clause.

Marriage, which is a civil institution, deriving its legal efficacy from the laws of the State, is in one sense a *contract*, often involving in its incidents extensive rights of property, and important obligations for the support of the wife, and the protection, maintenance, and education of children ; yet it is admitted not to be a contract within the meaning of this clause of the constitution.

A license granted under the authority of law, to keep a tavern or house of public entertainment, or to retail spirituous liquors ; (until lately, very common in this State) a license to keep a ferry ; a license to exercise the business of an auctioneer ; or a license to a traveling merchant or pedler, to exercise certain special privileges forbidden to the community at large, in the sale of merchandise within the State ;—each and all of these, and many others of a similar character, are special and exclusive rights and privileges granted under the authority of law, for fixed sums of money, and usually for specified periods of time. They are franchises, and partake much of the nature of contracts ; yet the constitutional authority of the legislature to control them, by amendment or repeal of the law regulating them, or by absolutely revoking or annulling them, with a view to the overruling considerations of the public interests, is unquestionable.

A law granting a pension to a person in consideration of public services, is in the nature of a contract, but it is undeniable that such a grant may be changed, suspended, or abolished by the amendment or repeal of the law.

A law providing peculiar advantages to foster and encourage any particular branch of business, is undeniably subject to amendment or repeal, at any time, although large investments in property may have been made under its inducements.

A law locating the seat of justice of a newly organized county at a particular village, on a proposition of the citizens of the village, in case of such location, to raise means by private contributions to construct the public buildings for the county, is in the nature of a contract. Yet it cannot be denied but that after the citizens of the village have complied on their part, and even con-

structed the public buildings, the legislature may, from considerations of the public interest, remove by law such county seat to some other place, or repeal the law creating the county, and thus not only take away the advantages of the county seat, but also strip the county officers of the emoluments, special privileges and civil authority derived from their respective offices.

When a common informer sues for a penalty, or a revenue officer makes a seizure, under a promise that on conviction the recovery shall be shared, the State may discharge the forfeiture, or prevent the recovery by a repeal of the law, and yet violate thereby no vested right, nor impair the obligation of any contract. 5 Cranch Rep. 281 ; 10 Wheat. 246 ; 6 Pet. 404.

A public office, conferring, as it usually does, a special privilege and authority to exercise a public employment, and a right to the emoluments and profits belonging thereto, for a specified term, bears a close analogy to a franchise, and presents the elements of an ordinary contract more strongly than does the charter of a corporation ; yet it is well settled, that even an officer, who has abandoned his private business, and changed his residence to the injury of his private interests, to perform the duties of his public employment, and for the faithful discharge of which, during his term of office, he may be bound with sureties in a bond under a heavy penalty, may be divested of his rights, privileges, and emoluments, by a repeal of the law creating and authorizing the office. *Butler* v. *The State of Penn.*, 10 How. Rep. 402 ; *The Com.* v. *Bacon*, 6 Serg. & R. 322 ; *The Com.* v. *Mann*, 5 Watts & Serg. 418 ; *Barker* v. *The City of Pitts.*, 4 Penn. St. Rep. 51 ; *The Com.* v. *Clarke*, 7 Watts & Serg. 127 ; *Conner* v. *The City of New York*, 2 Sandf. Rep. 355.

That the corporation of " The President and Trustees of the Ohio University," although in the technical classification of corporations it falls under the denomination of a private corporation, is a civil institution of the State, established with a view to internal government, will hardly be seriously questioned by any one. The constitution of the State under which it was established, expressly required that " *schools and the means of in-*

*struction should forever be encouraged by legislative provision,"* upon the ground that " religion, morality, and knowledge," were " *essentially necessary to good government.*" The governor of the State was made, *ex officio*, the president of the corporation; and the trustees were required to be elected by the legislature; and the university was endowed by a donation of public lands. Thus instituted as a means essential to the purposes of government, endowed at the public expense, and placed under the direction and superintendence of the civil authority of the State, to place its franchises and immunities beyond the reach of the power of the State, and give them a permanency superior to the. constitution, is to make a mere instrumentality of the civil authority paramount to the government itself; to make the creature superior to the creator.

It is essential to the binding *obligation* of every *contract*, (using that word in its ordinary signification,) that it have a *competent subject matter* about which the parties may *legally stipulate*, and which is not *against public policy.* There are many things, which are not in their nature competent subjects of *private contract;* and there are many things, which cannot be made the subject matter of *barter* or *sale*, without contravening some rule of law or principle of public policy. It must be conceded that neither the public relations between the government and the citizens, with the obligations and duties incident thereto, nor the grants of civil authority to public officers or agents, nor the ordinary regulations concerning the civil institutions of the State, can be made competent subjects of private contract. The right of suffrage in the citizen cannot be parted with by contract; nor can the duty of the government to afford to the citizen protection in his rights, be relinquished by contract. Where the subject matter of a contract is something which is to pass from one party to another, it must be a matter which is private property, either corporeal or incorporeal. The, constitution having provided that " *property and effects of every description whatever shall be made subject to taxation*, this court, in the case of *The Exchange Bank of Columbus* v. *Hines*, 3 Ohio St. Rep. 7, said, on the question

of the franchise of a corporation being made, by the constitution, a subject of taxation:

> "Does a corporate franchise, in sober truth and reality, possess the essential qualities of property? It is said that the corporate franchise of a bank, conferring a peculiar legal capacity, and the high function of making and circulating paper money, is *valuable*—indeed, a thing of great value. But *value* is not the distinguishing attribute of *property*, in its ordinary sense. The right of suffrage is esteemed valuable; a public office, with its emoluments, is valuable; a license to keep a tavern, as formerly granted in this State, or a license to carry on any special business which is prohibited without a special grant of authority from the government, may be valuable; and a right to either of these things may be asserted and maintained in a court of justice, yet neither of them possess the essential qualities which constitute property. Our right to the free use and enjoyment of things which are in common, such as air, light, water, etc., is *valuable;* and our right to the free use of the public highways, and to many of the privileges and advantages derived from the government, may be valuable, and may be maintained by legal process. Yet none of these things come within the denomination of property. Those things which constitute the subject matter of private property, are such as the owner may exercise *exclusive dominion* over, in the use, enjoyment, and disposal of them, without any control or diminution, save only by the laws of the land. 1 Wend. Blackstone 138. It is a fundamental principle, that property, considered as an exclusive right to things, contains not only a right to use those things, but a right to dispose of them, either by exchanging them for other things, or by giving them away to any other person without any valuable consideration in return, or even of throwing them away, which is usually called relinquishing them. Rutherforth's Ins. 20 ; Puffendorf, ch. 9, b. 7.
>
> "It is said that capability of *alienation* or *disposal*, either by sale, devise, or abandonment, is an essential incident to property. 2 Kent's Com. 317.
>
> "A corporate franchise, therefore, being a mere privilege, or grant of authority by the government, is not *property of any description*, and consequently not subject to taxation under the requirement of the constitution of the State.

That which is relied on as the *subject* of the alleged contract between the State and the university, in the case before us, is the *franchise* of the corporation, which, according to the doctrine insisted on, amounts to a relinquishment both of the *legislative power* of amending and repealing the law conferring it, and also, of the *power of taxation* over the university lands. And the question is presented, whether a relinquishment or surrender of a *portion* of the *legislative power*, including also a *portion* of the *taxing power*, can be made a legitimate *subject matter* of private *contract*. And the same question arises in either branch of

the case, whether considered with reference to the contract being a contract between the State and the lessee, or between the State and the corporation.

The *legislative* or *law-making power* is the highest attribute of sovereignty in every government; and the power of *altering* and *repealing laws*, is an *essential* and *indispensable* part of this legislative power. The *right* of *taxation* is also one of the high attributes of the supreme power in every government, *essential* to its continued existence, and *indispensable* as an instrumentality in the hands of the legislative power.

According to the theory of our institutions, all *civil power* originates with the people as a community, for whose benefit *solely* the government is established; and all powers not delegated to the government, are, by express declaration, reserved to the people. Civil society is said to be founded on a surrender, by the people, of a part of their original and natural rights, with a view to the protection of the balance, or the general welfare of the whole community. It follows from this, that the powers which the people have conferred on their government, are *high trusts* of civil authority, delegated *solely* and *alone* with a view to the common protection and general interests of the community at large. In the exercise of the functions of sovereignty thus delegated, individual rights have to yield to the paramount and over-ruling consideration of the public interests. This principle lies at the foundation of the right of *eminent domain*, and the right of *taxation*, by which private property is made subservient to the public use. And the penalties imposed in the administration of criminal justice, by which not only the property, but the liberty, and even the lives of individuals, are taken, rest upon no higher principle.

Can the legislature abridge or surrender these functions of the supreme power, by contract? Or can a relinquishment of any portion of them be made *the subject matter* of *contract*, or, (which is the same thing), of *private property?* Can these sacred trusts of the supreme civil power be made the *subject matter* of *barter* and *sale?* The ordinary rights of persons and property have to yield, and be made subservient to the over-ruling demands of the

public interests. Can these high trusts of civil authority, delegated with a *sole view* to the paramount considerations of the public interests, be diverted from the true objects of the trust, by contract, and made subservient to mere *private interests?* Can persons hold rights of *private property* in a surrender of these functions of sovereignty, and set them up as paramount to the public interests? These inquiries touch the fundamental principle involved in this controversy.

The original power of taxation extends to every thing which is the subject of private property within the State, and may impose its tribute thereon for the support of the government. That the legislature of 1802 could select its subjects for taxation, and exempt certain kinds of property from the burden, does not affect the question. A mere legislative exemption, subject to alteration or repeal in the discretion of the legislature, does not affect *the power* of taxation in the government. The question here is, whether a mere *legislative exemption* of certain kinds of property from taxation, can, by contract, be made an *absolute surrender of the power of the State to tax that property*, at any period in future. If the legislature has the right thus to surrender the power of the State to tax two townships of land, it must be conceded that, by the exercise of the same power, the right of taxation over all the lands in the State may be surrendered. Suppose, for example, that the legislature, at one session, deeply impressed with the great public advantages of agricultural and horticultural pursuits, and the necessity and expediency of encouraging those branches of industry, had provided by this kind of contract, that all the cultivated soil or lands in Ohio should be *forever* exempt from taxation; and suppose also, that the legislature, at a subsequent session, from *clear* views of public policy, should have, in the same manner, *forever* exempted all investments in manufacturing and mechanical pursuits, from all taxation; and, also, at another session, the commercial interests being found in a state of great depression, and requiring encouragement, a *similar* exemption from taxation had been provided for all investments in trade of every kind. On any attempt afterwards to repeal these exemptions, the persons engaged in business in each of these

branches of industry, would claim that they had acted on the exemption as being *forever*, and in view thereof, had made larger investments, and at higher prices, and, therefore, held their immunities by contract. And, according to the doctrine upon which the opinion of the majority of the court in this case is founded, this surrender of the power of taxation would place it beyond the power of resumption by the people of the State, either by the exercise of the legislative power, or the remodeling of the government by a new constitution, or even by regenerating their institutions by revolution. Such is the effect given to the operation of " *the superincumbent and inexorable prohibitions of the constitution of the United States !*"

But this is not all. It is claimed that the power of altering or repealing existing laws, which is an essential and inherent part of the law-making power, has been *abridged*, or in part *surrendered* by contract; and that it is not in the power of any future legislature to resume it, or of the people themselves, by the formation of a new constitution, to authorize a new legislature to resume this part of the legislative power, so far as to be able to supervise or control the statute of 1804, above mentioned, by amendment or repeal. Now, if the legislature can, in the enactment of a law, provide by *contract* against its alteration or repeal in an instance of this kind, the same thing can, of course, be done in all instances where special privileges and advantages are conferred on individuals or corporations in any other branch of business. And if the legislature can, at one session, in the enactment of laws, thus by contract limit or abridge the legislative power vested in this body, at any subsequent session, it can give a *permanency and stability to its laws superior to the constitution itself*. For the constitution is at all times subject to alteration by the people themselves, acting in their original capacity; but it is claimed, that this surrender of the legislative power by contract, places it beyond the power of resumption by the people themselves, even in case of revolution and re-construction of the State government.

Suppose the legislature should, at one session, provide by law that, in consideration that the banks of each county of the State should agree to bind themselves to receive on deposit and safely

keep the public moneys of the State, whenever the revenue officers should find it convenient to use them as depositaries, they (the banks of each county) should be forever exempt from all laws restricting their business, and forever be allowed to assess upon and collect from the taxable property of the people of the county, any amount of tax which they might deem necessary and proper for their own support and convenience. According to the doctrine advanced, this legislative arrangement could not be altered or repealed, either by legislation or change of government. This would be truly making the restrictive clause of the constitution of the United States " *superincumbent and inexorable!* "

If the power of taxation, and the power of amending and repealing laws, can be thus surrendered, I cannot conceive what other important function of the supreme power of the State might not be surrendered in the same way. Suppose that the legislature, in order to encourage the products of a particular branch of agriculture, should provide that all lands used or cultivated for the purposes of such products, should be *forever* exempt from the exercise of the *right of eminent domain.* According to this doctrine, would not this high function of sovereignty be, *pro tanto,* surrendered, beyond the possibility of resumption or redemption by the people of the State ? Where is the distinction between a surrender of this and these other functions of the civil power ? The right of eminent domain is no more important, or sacred, or essential to the existence of the government than the right of taxation, or the right of altering and repealing laws. If a surrender of the latter may be made the subject matter of contract, the surrender of the former may be so also.

The power of imposing penalties in the administration of criminal justice, is one of the functions of the supreme power of the State. Suppose that the legislature, acting from supposed elevated views of public policy, and to encourage men to engage in the highly useful business of corporations generally, should have provided that all persons who should engage in the service of corporations, or become stockholders therein, should be *forever* exempt from all penalties or punishment for crime. Here would be the semblance of a contract with all who should engage in the

service of corporations, or become stockholders, after the passage of the law.   Why would it not be binding on the State, according to the doctrine advanced ?   If a surrender of the functions of the civil power may be the subject matter of contract in one instance, why not in another ?   Will it be said, as to this last instance, that it would be against public policy, and therefore void as a contract?   If so, the inquiry would be pertinent, why would not the surrender of the high functions of sovereignty in derogation of the important objects of their delegation in the other instances, and also in those involved in this case, be void as against public policy ?

The general scope and tendency of this doctrine is forcibly exposed by Mr. Justice Campbell, in his very able dissenting opinion in the case of *Dodge* v. *Wolsey*, 18 How. Rep. 372, recently decided in the Supreme Court of the United States, the following extract from which I deem appropriate, and worthy of the most serious consideration :

" The proposition of this confederacy of some fifty banking corporations, having one fortieth of the property of the State, is, that by the law of their organization for the whole term of their corporate being, there exists no power in the government nor people of Ohio to impair the concessions contained in the act of 1845, particularly that determining the amount of their contribution to the public revenue.  This proposition does not depend for its truth upon the limitation of time imposed upon the corporate existence of the banks. It would not affect the proposition if the charters were for a century, or in perpetuity.  Nor does the proposition derive strength from the fact that the statute applies only to banking corporations, or corporations confined to a single form of commercial dealing.  The proposition would have had the same degree of accuracy, if the act had been universal, applicable to all private corporations, whether for manufacturers, trade, intercourse, education, morals or religion.  It is said by a competent authority, that in the State of Massachusetts, there are near twenty-five hundred trading corporations, and that more than seven-tenths of the real and personal property of that State is held by corporations.  The proportion between the property of corporations and individuals, is greater there than in other States, but the property held by corporations in other States is large enough to awaken the most earnest attention.  A corrupt legislature, for a term or in perpetuity, would impair in many States their resources to an alarming extent.

" Writers upon the condition of the Turkish empire, say that three-fourths of the landed property of the empire is held in mortmain, as vakuf by mosques or charitable institutions, for their own use, or in trust for their owners.  This

property ceases to contribute to the public resources, except in a specific form of certain objectionable taxes on produce, and is inalienable. If held in trust, it is exempt from forced sales and confiscations, and on the death of the owner without children, passes to the mosque or other charitable trustee. In that empire, the ecclesiastical and judicial is the dominant interest, for the ulemas are both priests and lawyers, just as the corporate moneyed interest is dominant in Ohio, and in either country that interest claims exemption from the usual burdens, and ordinary legislation of the State. The judgment of this court would establish the permanent existence of such an incubus upon the resources and growth of that country, if that interest should have taken their privileges in the form of a contract, and had such a constitution as ours. Yet the first step for the regeneration of Turkey, according to the wisest statesmanship, is to abolish the vakuf.

"Bentham, treating upon constitutional provisions in favor of contracts, says: 'If all contracts were to be observed, all misdeeds would be to be committed, for there is no misdeed, the committal of which may not be made the subject of a contract ; and to establish in favor of themselves, or of any other person or persons, an absolute despotism, a set of legislators would have no more to do than to enter into any engagement—say with a foreign despot, say with a member of their own community—for this purpose.' And were this to happen, should it be that a State of this Union had become the victim of vicious legislation, its property alienated, its powers of taxation renounced in favor of chartered associations, and the resources of the body politic cut off, what remedy has the people against the misgovernment? Under the doctrines of this court none is to be found in the government, and none exists in the inherent powers of the people, if the wrong has taken the form of a contract. The most deliberate and solemn acts of the people would not serve to redress the injustice, and the overreaching speculator upon the *facility* or *corruption* of their legislature, would be protected by the powers of this court in the profits of his bargain. Where would the people find a remedy? Let the case before us form an illustration. Congress cannot limit the term nor abolish the privileges of these corporations ; they are corporations of Ohio, and beyond her limits they have no legal existence ; they live in the contemplation of her laws, and dwell in the place of their creation. (13 Pet. 512 ; 16 How. 314.) Nor can congress enlarge the subjects for State taxation, nor interfere in the support of the State government. They could not empower the State to collect taxes from these corporations. Were the resources of the State oppressed with the burden of a Turkish vakuf, congress could not afford relief.

" The faculties of the judicial department are even more fatal to the State than the impotence of congress. The courts cannot look to the corruption, the blindness, nor mischievous effects of State legislation, to determine its binding operation. (*Fletcher* v. *Peck*, 6 Cr. 87.) The court, therefore, becomes the *patron* of such legislation, by furnishing motives of incalculable power to the corporations to stimulate it, and affording stability and security to the successful effort. Where, then, is the remedy for the people ? They have none in their State government, nor in themselves, and the federal government is enlisted by their adversary. It may be that an amendment of the

constitution of the United States, by the proposal of two-thirds of congress and the ratification of the legislatures of three-fourths of the States, might enable the people of Ohio to assess taxes for the support of their government upon terms of equality among her citizens.

"The first observation to be made upon this is, that these extraordinary pretensions of corporations are not unfamiliar to an inquirer into their nature and history. The steady aim of the most thoroughly organized and powerful of the corporate establishments of Europe has ever been to place themselves under the protection of *an external authority, superior* to the government and people where they dwell—an authority sufficiently powerful to shield them from responsibility, and to secure their privileges from question. * * * *

"The sagacious and far-sighted members of the ecclesiastical interests, fortified themselves with *concordats*, and these concordats were affirmed to be ' contracts;' and, like these, ' entail obligations ;' and 'if the bond of a bargain is to be respected in private life,' so they declared, ' it is sacred and inviolable in the life of States.' A slight change of expression will demonstrate that the principle of corporate policy, the dictate of corporate ambition which has predominated in the contests of Europe, leading to desolating wars, is the same which this court is required to sanction in favor of corporations in the United States."

And in the same opinion, on page 373, the learned Judge further said:

"The allowance of this plea interposes this court between these corporations and the government and people of Ohio, to which they owe their existence, and by whose laws they derive all their faculties. It will establish on the soil of every State a caste made up of combinations of men for the most part under the most favorable conditions in society, who will habitually look beyond the institutions and the authorities of the State to the central government for the strength and support necessary to maintain them in the enjoyment of their special privileges and exemptions."

The misapplication of the civil power, and prostitution of it to the purposes of mere personal aggrandizement, has been one of the greatest evils, and perhaps the greatest source of abuse, in civil government, in all ages of the world. And with all proper deference for the opinion of the majority of the court to the contrary, I must be permitted to say, that I regard the doctrine that the charter of a corporation is a contract, and that the high functions of the supreme power of the State may be surrendered by such legislative contract, as a subtle device resorted to in this country, to pervert the civil power from the high purpose of its delegation, and to use it for the advancement of special and favored private interests. And, as I humbly conceive, the doc-

26

trine is founded upon a fiction and a fallacy; for there is no contract, in the ordinary signification of that term, and within the true intent and meaning of the restrictive clause of the constitution of the United States. Even suppose it to possess the other elements of a contract, which I do not concede, the thing claimed to be contracted for cannot, from its inherent nature, be the legitimate subject matter of private contract: 1st, because the relation between the State and the corporation is one of those political relations which cannot be constituted by contract, within the meaning of the constitution. 2d, because the power of altering and repealing laws, and the power of taxation, are essential functions of sovereignty delegated by the people of the State to the government, to be used at all times, whenever the public interests may require; and therefore not capable of surrender to any extent, by contract with any private person. 3d, that the functions of the sovereign power of the State must remain complete, and be at all times in full force, and subservient to the public interests, and therefore not capable of being surrendered or parted with by contract, in order to be made subservient to mere *private interests*. And 4th, because the power is not given by the constitution of the State to any department or branch of the government, to surrender, or in any manner whatsoever, to part with or diminish any of the powers delegated by the people, in order to promote or advance the personal interests either of any *private corporation*, or individual.

It is argued, however, " that a State may surrender a portion of her sovereignty ;" that " the whole line of history is dotted with examples of such surrender ;" that " Great Britain surrendered her sovereignty over this vast empire ; France over Louisiana ; and Mexico over California." Now, with all due deference, I must say that I am unable to perceive any bearing whatever, that this argument can have on the question under consideration. What has been, and what may be done, by *treaty* or *compact*, between independent nations, in the change or transfer of dominion or civil power from one set of authorities to another, or the hands of one set of men to another, has, as I humbly conceive, no analogy to the *subject matter* of *private contract*. When

civil power is transferred from one nation to another, or from the hands of one set of men to another, it is still presumed to be held for the high purposes of its delegation, the protection and advancement of the public interests and welfare of the community or people, subject to its dominion. But contracts with private individuals or private corporations, are very different things from treaties or compacts between independent nations, and different especially and most essentially, as to the *inherent nature* of the *subject matter* of such agreements. When governments or nations treat or enter into compacts with each other, they negotiate as sovereignties, and with reference to the protection and welfare of the people over whom they hold their dominion, and for whose common benefit or public interests their powers of sovereignty were delegated. But when a State or government enters into a contract with one of its own subjects or private corporations, it places itself on an equal footing with the private person, and negotiates only in regard to those matters which are the legitimate subjects of private contract. The transfer of dominion or civil power from one nation to another, or one set of men to another, by treaty, compact or change of government, or remodeling and reconstructing a government, is one thing; and a surrender of the functions of sovereignty to an individual subject or private corporation, another and very different thing. Private property and private rights may be taken in the proper mode by the government, and made subservient to the public welfare. But the high functions of the sovereign power of the State cannot be surrendered or parted with by mere private contract, and made subservient to the *private interests* of any individual citizen, or private corporation. The civil power is delegated from paramount considerations of the public interests, and the common benefit of the whole community; and any attempt on the part of the agents of the government, to surrender, or part with, any of its high functions, in order to advance special and favorite individual or private interests, would be not only an abuse and perversion of sovereign authority, but a fraud upon the people of the State.

The maxim *salus populi suprema lex*, embodies an all-controlling principle founded upon the implied assent of every member

of the community, that his own individual welfare shall, in cases of necessity, yield to that of the community ; and that not only his property, but also his liberty, and even his life, may, under certain circumstances, be placed in jeopardy, or even sacrificed for the public good. And in cases of extreme or stringent emergency, it is settled, and all civil government is conducted on the principle that private mischief has to be endured rather than a public inconvenience, upon the maxim *necessitas publica major est quam privata.* But the doctrine of the majority of the court, as I conceive, not only ignores the maxim *privatum incommodum publico bono pensatur ;* but overrides the principle *that regard for the public welfare is the highest law,* and places the private and derivative rights arising under the civil institutions of the State, paramount to the original sovereignty and inherent right of the people to self-government.

Again, it is argued that the power to make contracts is one of the sovereign powers of the State; that the most that can be said of this surrender of the functions of sovereignty by contract, is, that it is an abuse of authority ; and that the non-existence of a power cannot be shown by its abuse, or liability to abuse. No one questions the capacity of the State to make contracts of the ordinary kind. Although not among the express grants of power in the constitution, it is one of the *incidental powers* of the government—a *necessary instrumentality or means* in the execution of the civil authority of the State. I do not deem it necessary to inquire, whether a contract obtained by an abuse or perversion of civil authority, and in derogation of the high and sacred purposes for which sovereign power was delegated, would be void on the ground of being against public policy. Where a power, vested in one of the departments of the government, has left a discretion as to its exercise in that department, and that discretion is unwisely and improvidently exercised, a mere abuse of *the discretion* may not be an abuse of *the power.* But where *the power* is abused, and perverted from the purpose of its delegation, and prostituted to purposes inconsistent therewith, the act of the department, upon ordinary principles, would be declared void.

The power of the State to make contracts, must be understood to be a power to enter into contracts, in the usual and ordinary signification of that term, and no other or different power. It is not a power to make a contract about a matter which, in its nature, cannot be made the subject matter of a contract. It is not a power to change the nature of a thing, and make that the subject matter of a contract, which, by the ordinary rules governing contracts, could not be the basis of a contract. Suppose the enactment of a law, providing for an engagement with all persons who might thereafter purchase land and engage in agricultural pursuits, that they shall hold their lands and other property forever exempt from the right of eminent domain, in any and all emergencies. Such an exemption would certainly not be binding as a contract, but would be void, not for the want of capacity in the State to make an ordinary contract, but because such surrender of the right of eminent domain could not, in its nature, be the subject matter of private contract. Again, suppose the enactment of a law, providing for an engagement that all persons who might thereafter embark their capital in the mercantile business, should be forever exempt from all penalties or punishment for crime. Or, suppose the enactment of a law, providing for an engagement with all persons who may hereafter engage in the business of exchange brokers and private banking, that they shall be forever exempt from all usury laws, and all exercise of the legislative power of the State imposing regulations and restrictions of any kind on them in their business transactions. In either of these instances, the engagement would be invalid as a contract, because any such surrender of the legislative power could not be made the subject of barter and sale. Upon the same principle, neither the surrender of the power of taxation, nor of the power to alter or repeal a law, nor of any other function or part of the legislative power of the State, can be made the subject matter of private contract. Because, therefore, as an incident to the execution of the powers of the government, the State may make a contract of the ordinary kind, it does not follow that the legislature has the power to surrender, in the form of contract, even the power of contracting itself, or any of the other

powers vital and essential to the very existence of the government.

It is argued, however, that the people of the State themselves could, *by contract*, surrender, or yield up, any portion of their incidental right of taxation, or other function of their sovereign power ; and that they have, by the grant of legislative authority in general terms, conferred that power on the general assembly. There are two answers to this, either of which is perfectly conclusive. In the first place, sovereignty can be legitimately delegated by the people only for the purposes of civil government. According to the theory of our institutions, government can be *rightfully* established only for the benefit of the governed, or the common interests of the people as an organized community ; and the use of civil power, for the mere advancement of personal or private interests, is a usurpation and perversion of public authority from the true and legitimate object of its delegation. Government is a necessary burden, the true design and end of which is *security* and *protection* to the *common rights and interests* of the people. The prerogative of civil authority, therefore, which originates in the necessities of the people, ends with the accomplishment of its only legitimate purpose. Founded upon any other principle than the delegation of power for the common benefit of society, government becomes an assumption of power for the aggrandizement of itself, or of favored private interests, by the oppression of the great body of the community. The proposition, therefore, that the people, in the exercise of their original powers as an organized community, may unalterably surrender, or yield up their powers of sovereignty, by contract, for the advancement of *personal or private interests*, places civil authority upon a false foundation, and concedes a right in the people to make slaves of themselves. The prerogative of sovereignty, therefore, in the hands of the people, in their original capacity as an organized community, is a mere instrumentality of civil government, and can only be exercised pursuant thereto, and cannot be made the *subject matter of private contract*.

That the people, in the formation of the constitution of the State, may define the delegated powers, prescribe limits and regu-

lations for their exercise, and, in so doing, may exempt some things from taxation, and prescribe what shall be the subjects of taxation, is not questioned.   And, in doing this, there is a simple *exercise*, and not a *surrender*, of any of the original powers of the people.

In the second place, the question at issue, however, is not what the people might have done, but what they actually did do, in the formation of the constitution of 1802, under which this act of 1804 was passed.   The taxing power, which is included in the legislative authority of the State, was by that constitution vested in the general assembly, in general terms, with no limitation, except the prohibition of the levy of a poll tax, for county or State purposes.   The power of taxation, in the language of Chief Justice Marshall, in *McCulloch* v. *Maryland*, 4 Wheat. R. 316, "is an incident of sovereignty, and coëxtensive with that to which it is an incident.   All subjects over which the sovereign power of the State extends, are objects of taxation."   The authority conferred, therefore, gave the legislature the right to *exercise* the power of taxation over all property within the State, whenever necessary to accomplish the lawful purposes for which the government was established.   This authority was vested in the legislature as a continuing body; and it consisted in the right *to use* or *exercise* the power for the high purposes of its delegation, and not the right to *abridge, surrender*, or *dispose of the power* itself.   That the legislature, under the constitution of 1802, had the right to exercise a discretion as to the kind of property which should be taxed, and to exempt certain kinds of property from taxation, is not questioned, and does not affect the question under consideration.   For, while the right of amending and repealing laws remained in full force, whatever error might be committed by the legislature at one session, could be corrected at the next; so that the *power* conferred on the legislature, whether exercised to its full extent or not, remained the same. A mere *legislative exemption* from taxation is a very different thing from a surrender of the *power* of taxation.   If the legislature had the authority to surrender, abridge, or dispose of the functions of sovereignty delegated by the constitution, it had the

power not only to change the constitution, but, according to the doctrine asserted, to make its alterations more permanent than the constitution itself. When the general assembly convened, in 1804, it found the government in the unquestioned possession of the sovereign right of taxation, for the accomplishment of all its legitimate objects, extending to all the persons and property within the jurisdiction of the State. When its successor convened, in 1805, to exercise the legislative authority under the same constitution, it found, according to the doctrine asserted, the government shorn of the power of taxation, for all time to come, over two townships of land still within its jurisdiction, and protected by its laws, without compensation, save the encouragement of a measure of supposed public policy. If this be correct, each succeeding legislature had the same authority to surrender the power, as to any, or all other property; so that, at length, an unfaithful legislature might have deprived the State of all its sources of taxation, to raise means to attain its necessary ends, by the exercise of its delegated powers, and thus effected the inevitable destruction of the government; and that, too, beyond all power of remedy thereafter, either by the legislature, or by the people. It is no answer to this, to say that *confidence* must be reposed in the legislature, that it will not abuse its powers. In the language of Chief Justice Marshall, in *McCulloch* v. *Maryland*, 4 Wheat., *" Is this a case of confidence?"* Where is the boasted security and advantage of a written constitution, if it has not provided barriers against the exercise of dangerous powers, and especially such as may, in the hands of unfaithful men, prove utterly destructive to the government, and disastrous to the independence and sovereignty of the people, beyond all hope of remedy?

The same public exigency which required the exercise of the taxing power, as a means, when the constitution was formed, has continued with even increased demands, and will continue as long as the government endures. The power was granted as a mere *delegation of authority*, to be exercised when and as the public necessities might require; and not as property subject to disposition or sale upon contract. The power consisted in the mere right to *use* or *exercise* the authority for the purposes of the gov-

ernment, and not the right of ownership, or dominion over it, as property subject to sale on contract. And the power of amending and repealing laws, which must be coëxtensive with the power of enacting laws, was the means of preserving the taxing power in full force, and preventing a perpetuity in its abuse. And the legislature is no more competent to surrender, or dispose of, by contract, the power of altering existing laws, than the power of enacting laws.

It is argued, further, that all civil power is liable to abuse; that the power of taxation itself may be abused; and that "*final reliance must be placed on the instincts of self-interest and self-preservation, and the provident intelligence of the people.*" Is, then, a perversion or prostitution of the functions of the sovereign power of the State, to be made *perpetual* and *unalterable,* because of the liability of all civil power to abuse? This argument only proves the foresight of the wise men, who have gone before us, in their expenditure of time and treasure, in the formation of written constitutions, defining with great precision the delegated powers of the government, and providing checks, safeguards and remedies against the abuse of power. And the most important primary remedy and safeguard provided against all abuses of the legislative authority, is to be found in the power of amending and repealing laws, which is, of necessity, coëxtensive with the power of enacting laws, and remaining in full force in the legislature at every session, as a continuing body. By this means one legislature can correct and reform the abuses and mistakes of another. Thus, if the power of taxation be abused by one legislature, the people have the power to correct it by the next. And as a remedy of dernier resort, in case the powers of the government become impaired, and its energies broken down, beyond the reach of adequate recuperation by the exercise of the legislative power, the radical mode of regenerating the government, by the action of the people in their original capacity, in the resumption of their powers of sovereignty, and the formation of a new constitution, is not only recognized, but expressly prescribed. But according to the doctrine of the ma-

jority of the court in this case, if the abuse of civil power has assumed the form of contract, the people are wholly without remedy, either by legislation, or change of constitution. And although the abuses, which may be such as to cripple the resources of the State, create unjust and oppressive burdens on a part of the people, and greatly to impair the efficiency of the powers of the government, and may have been produced through the corruption or incompetency of the legislature, at a single session, yet, if they have taken the form of contracts, they are held to be *perpetual* and *unalterable*, by the operation of the "*inexorable prohibition*" of the constitution of the United States. If this be the case, I respectfully inquire, where is the virtue in that "*final reliance on the instincts of self-interest and self-preservation, and the provident intelligence of the people?*" What can the people do through their "*provident intelligence,*" when the abuses of civil power, and even the surrender of the high functions of sovereignty, have received at the hands of a single legislature a permanency and stability not only beyond the permanency and stability of the constitution of the State, but beyond the possibility of remedy in the recuperative energies of the people, in the exercise of their original sovereignty? And any attempt on the part of the people to break loose from this thraldom, to resume the impaired functions of their sovereignty, and regenerate their government, would be, according to the views advanced in the opinion of the majority, "redolent with the odor of repudiation," and denounced as just cause of war by "the code of international morality, sanctioned and enforced by the general conscience of christendom!"

It is said that the question, whether the recent legislation of the State impairs the obligations of the alleged contract, admits of but one answer: and of this legislation, which is characterized as "*a seeming manifestation of Carthaginian faith,*" it is said, that, although it would be "gladly presumed to be the result of oversight," if it could be; yet that the "language is too explicit and direct to admit of so charitable a presumption." Now, if this court had the power of impeachment, and the members of

both branches of that general assembly were arraigned before us, on the charge of a misdemeanor in office, it might be pertinent, and perhaps material, to inquire into the *quo animo,* and adjudicate as to the motive or intention of the accused.   But in the case before us, to convict the members of that general assembly of corruption in office, is not simply to condemn a party unheard, and in regard to a charge not preferred, but which, I must be permitted to say, shows that differences may exist even as to matters of decorum in the conduct of coördinate departments of the State towards each other.

The constitution of the State provides, in imperative language, Art. 12, sec. 2 : " Laws shall be passed, taxing, by a uniform rule, all moneys, credits, investments in bonds, stocks, joint stock companies, or otherwise ; and also, *all real and personal property,* according to its true value in money."   Leasehold estates of real property, held under the authority of any college or university of learning, are not among the constitutional exceptions to this rule of taxation.   If this constitutional provision was obligatory, the legislature had no discretion ; for the words " *all real and personal property* " in the State, manifestly included these university lands.   And the general assembly, in carrying out this imperative provision of the constitution, in the tax law complained of, did not specify these particular lands, but provided for taxing all real and personal property, in almost the identical words of the constitution.   If there be any wrong about this tax, therefore, it originated in the constitution itself, which one member of this court assisted to frame, and which was ratified by an overwhelming majority of the people of the State.   Now, while the majority of this court are entitled to be respected in their claim to act, in the decision of this case, from a high sense of the obligation of the judicial oath *to support the constitution of the United States,* it does not require, in my humble opinion, the exercise of charity to presume, that the members of that general assembly, in the enactment of this law, may have acted from a sense of the obligation of their official oath *to support the constitution of the State.*

An observance of the imperative behest of the constitution by

the legislature, cannot be charged as an *intentional wrong*. There is no violation of plighted faith, or honor of the State, involved in this matter. If, from mistaken views of public policy, and of the powers delegated by the constitution, or through the over-reaching influence of the agents of corporations, acting on the pliancy of the legislature, grants of exemptions, even in the nature of contracts, had been obtained, in derogation of the prerogative of the sovereignty of the people, it is no act of bad faith or violation of honor, either for the people, in remodeling their constitution, to resume their abused powers, or the legislature, acting under the authority of the constitution, to repeal or alter the pretended perpetuities in exemptions from equality in the public burdens.

Much has been said about the power of the legislature to make contracts, in the enactment of laws. Whether the making of a contract on the part of the State, be the exercise of an *executive duty* or a *legislative power*, I do not deem it important to stop to inquire. A law is defined by standard authority as a rule of civil conduct or legislative mandate, prescribed by the supreme power of the State. But whether it be in the nature of this rule of action to assume the form of a contract, I will not take time now to discuss. It may be remarked, however, that in the enactment of laws, few, if any of the members of the legislature, ever understood that they were engaged in the business of driving a bargain, or settling the terms of a contract. And those persons who have petitioned the legislature of Ohio for the passage of laws conferring special privileges and exemptions, have, in truth, asked for legislative favors, and not proposed to purchase the enactment of laws, or pay for the advantages asked. If the special privileges and exemptions conferred on corporations generally be the subject matter of contract, why should they not be sold or disposed of to the best advantage, with a view to raising a revenue thereby for the State ?

If the charter of a corporation be a contract, it must be founded on a mutuality of consideration, and create a mutuality of obligation. For these are essential ingredients in every contract. Can a law incorporating a company be the foundation of a proceeding in equity, to compel the specific performance of a con-

tract, or of an action at law for the recovery of damages for the breach of its conditions? A liability to compulsory process for specific performance, or for the payment of damages for the breach, of a contract, is a *test* of the existence of a legal contract obligation of "*the ordinary kind*," and *this*, according to Chief Justice Marshall's interpretation, is the only kind of a contract that falls within the operation of the restrictive clause of the constitution of the United States. It is a familiar maxim, that there can be no wrong without a remedy; and a remedy is provided for the enforcement of all contracts of " the ordinary kind." In the case of a private corporation, suppose that, either the corporation or the corporators should refuse to perform the duty enjoined by the terms of the charter, or suppose a positive breach of the express conditions of the charter; will it be pretended that a suit could be sustained on behalf of the State, either for a specific performance, or for a breach of the contract? What would be the form of the remedy? What the form of the decree or judgment? What the measure of the damages, or the rule for their assessment? A petition in equity to compel the specific performance of the conditions of the charter of a corporation, or a suit for damages by the State for the breach of the conditions of the charter, would be truly a novel proceeding in our jurisprudence. True it is, a writ of *quo warranto* may be brought to declare *the forfeiture of a franchise* for non-feasance or misfeasance, or a *mandamus* will lie to compel the performance of *some duty enjoined by law;* but these are not proceedings applicable to the enforcement of contracts, or personal redress for their violation.

Where there is no *mutuality of obligation* there can be no contract. Those who form associations, and engage in the business of private corporations of the ordinary kind, do it voluntarily, and solely from considerations of personal and private interests. No *obligation* is imposed on them to engage in the business, in order to advance the public interests. They pay the State no bonus or compensation for their privileges. After the charter is granted, they are not bound to organize and commence business. And at any time after they do organize, they are at liberty to discontinue the business, withdraw their stock, and dissolve

the corporation, whenever they find that their private interests require it. It is said that they are bound to conform their business to the regulations of their charter. These are made with reference to the protection of the public interests. Persons engaged in all branches of business, without the special privileges of a charter, are bound to conform their business to statutory regulations adopted with a view to public policy. And the State does not make contracts with persons to observe or obey the laws. Where, then, is the contract-obligation resting upon, either the corporators, or the corporation? If any supposed advantages result incidentally to the public, from the business of corporations, it does not arise from any legal obligation imposed on either the corporators or corporation, and is, therefore, only that consequential benefit which may accrue to the public from business authorized in any of the other pursuits of the people. General laws are often enacted conferring special advantages with a view to encourage particular productions in agricultural, mechanical, and other pursuits, whereby persons are often induced to make large investments of property in the business of such pursuits. Tariff laws have been enacted in this country, for the protection and special advantage of domestic manufactures, whereby investments of large amounts of capital have been induced, in the favored pursuits. In all such cases, however the duty of *good faith* on the part of the government, may be involved in the matter, no one has ever claimed that any such law constituted a contract, within the contemplation of the restrictive clause of the constitution of the United States.

In what does *the obligation* on the part of the State, in this alleged contract, consist? The law incorporating the Ohio University was passed from views of public policy, and not on account of any bonus or compensation paid to the State. What is it that became obligatory on .the State, by the grant of important privileges and immunities to the corporation? It is said that the State became bound not to *alter* or *repeal* the law. The alleged contract-obligation on the part of the State, therefore, consists in *a stipulation* not to alter or repeal the law conferring the franchise and immunities on the corporation; and this im-

portant obligation, whereby not only the sovereign power of the State, to amend and repeal laws, but also the power of taxation, was partially surrendered forever, rests on the consideration that the corporators accepted the proffered favors. This is a one-sided contract. In consideration that the corporators would accept the proffered favors, (and which they no doubt sought, or requested of the legislature,) the State became bound in a stipulation to *surrender forever* a portion of its functions of sovereignty. This is truly an instance where one favor entitles the beneficiary to require another, and even more important, advantage of the benefactor, and that, too, *as a matter of right!* As a law, simply enacted from elevated considerations of public policy, this statute is susceptible of a rational exposition. But as a contract for the surrender of a portion of the functions of the supreme power of the State, it involves, I must say with all due deference, many legal absurdities, not the least of which is the consideration for the obligation on the part of the State, which, by no reasonable and fair explication, can be made anything better than a fiction.

I have thus far considered the subject, with a view of showing from the intrinsic circumstances, and nature of the subject matter, and the constitutional powers of the legislature, that no contract existed within the true intent and meaning of the restrictive clause of the constitution of the United States. There is yet another point of view, arising out of the interpretation of the statute, which appears to me to be, also, very clear and conclusive against the existence of any such contract.

Conceding, for the sake of argument, that such a contract were possible, consistently with the nature of the subject matter, and within the scope of the legislative power, where is the evidence of its existence in this case? It is incumbent on the party averring the existence of a contract, to show it affirmatively. The important stipulation of the alleged contract, the obligation of which, it is said, has been impaired by recent legislation, is, *that the State shall not alter or repeal the provisions of the statute of* 1804, *incorporating the Ohio University, and exempt-*

*ing the university lands from taxation.* ' This stipulation, if it exist, being one of very great consequence to both of the parties, amounting, in effect, to a surrender of a part of the functions of sovereignty, should appear by *express provision* in the terms of the contract, and not be left to the doubts and difficulties of mere *implication.* And inasmuch as the power of altering and repealing laws is an inherent part of the legislative power, to the exercise of which all laws must be liable, at all events, unless specially exempted, the presumption, upon every rational hypothesis, must be against the surrender of the power, if it be not provided for, *in express terms.*

Now, the statute of 1804, incorporating the Ohio University, contains no provision whatever surrendering the power, or in any form expressly stipulating against the exercise of the power of altering or repealing the laws. So that if this important stipulation in the alleged contract cannot be derived from *implication* or *construction,* it must be conceded that it does not exist. In saying this, I am not forgetful of the language of the 17th section of the law, to the effect that the exemption from taxation, " *shall be forever.*" Had this exemption been inserted in the constitution of the State, as one of the regulations or terms on which the taxing power was delegated, it would have operated as a constitutional limitation on the exercise of the legislative power. But, as it is, it amounts to nothing more than a *mere legislative exemption,* which is operative, it is true, until altered by the subsequent exercise of the legislative power. The fact that it contains the words "*shall be forever,*" cannot change the nature of the enactment, and give it a permanency equal to, or (according to the doctrine asserted by the majority of the court) superior to that of a constitutional limitation, on the exercise of the taxing power. A large proportion of the laws enacted by the legislature, are designed to be permanent, and language of perpetuity is not at all unusual in legislative provisions of various kinds. Suppose the enactment of a law providing that all cultivated lands *should be forever exempt* from all taxation ; or providing that the salary of the Governor of the State *should be forever* five thousand dollars a year ; or in cases where the tenure

Matheny et al. *v.* Golden, Treasurer of Athens County.

of office is left to legislative regulation, suppose a law providing that the tenure of the office *should, forever, be* for life. In either of these cases, would any one doubt the power of amendment and repeal by any subsequent legislature ; and in the last instance, even in the lifetime of the incumbent of the office ? The language of perpetuity used in such laws, would be a manifestation of the *legislative will,* or *views of public policy,* and not an attempt to *surrender* or *abridge the legislative authority.* In the enactment of this statute of 1804, the legislature did not, by any express provision, even *assume* to surrender or abridge the authority of any future legislature to amend or repeal it. The perpetuity of the exemption from taxation depended on the *continued existence* of the law. And inasmuch as it was not provided in express words, that *the law* should be *exempt* from the *power* of *amendment* or *repeal,* the words of perpetuity connected with the mere legislative exemption from taxation, amounted to nothing more than an expression of the legislative will, or views of public policy, that the exemption ought to be left to stand, and the power of a subsequent legislature to change it, not be exercised. This provision, creating the exemption from taxation, therefore, is susceptible of a plain and rational interpretation not inconsistent with the ordinary exercise of the legislative power. A mere legislative exemption of certain property from taxation, is a very different thing from a *surrender to any extent of the taxing power itself.* The former cannot effect a surrender of the *power* of taxation, unless the power of altering or repealing the law be also surrendered or relinquished. Now, as the exemption of this law from the exercise of the power of amendment and repeal by a subsequent legislature, is not *expressly provided for,* it cannot exist, unless it be derived from the law by *implication* or *construction.*

If there be anything well settled in regard to corporations, it is that laws conferring their privileges and immunities, must be strictly construed. *Bank of Chillicothe* v. *Swayne,* 8 Ohio Rep. 286 ; *Ohio* v. *Granville Alexandrian Society,* 11 Ohio Rep. 12. Any ambiguity in the terms of the charter of a corporation, must operate against the corporators and in favor of the public ;

27

and the corporators can claim nothing that it is not clearly given by the act. 2 Barn. and Adolph. 793. In the case of *Charles River Bridge* v. *Warren Bridge*, 11 Pet. Rep. 544, wherein a surrender of the right of eminent domain was claimed, on the ground that it might be, and had been so used as to destroy the value of the franchise granted to the corporation, Chief Justice Taney, delivering the opinion of the court, said : " It would present a singular spectacle, if, while the courts in England are restraining, within the strictest limits, the spirit of monopoly, and exclusive privileges in the nature of monopolies, and confining corporations to the privileges plainly given to them in their charters, the courts of this country should be found enlarging those privileges by implication, and construing a statute more unfavorably to the public and to the rights of the community, than would be done in a like case in an English court of justice." Again he adds : " It may, perhaps, be said, that in the case of the Providence Bank, this court were speaking of the taxing power, which is of vital importance to the very existence of every government. But the object and end of all government is to promote the happiness and prosperity of the community by which it is established, and *it can never be assumed that the government intended to diminish its power of accomplishing the end for which it was created.*" " A State ought never to be presumed to surrender this power, because, like the taxing power, the whole community have an interest in preserving it undiminished." " *The continued existence of a government would be of no great value, if by implications and presumptions, it was disarmed of the power necessary to accomplish the ends of its creation ; and the functions it was designed to perform, transferred to the hands of privileged corporations.*" * * * * " While the rights of private property are sacredly guarded, we must not forget that the community also have rights, and that the happiness and well being of every citizen depends on their faithful preservation."

And, in the case of *Providence Bank* v. *Billings,* 4 Pet. Rep. 561, Chief Justice Marshall, delivering the unanimous opinion of the court, said : " *Any privileges which may exempt it* [the corporation] *from the burthens common to individuals, do not flow*

*necessarily from the charter, but must be expressed in it, or they do not exist.*"

Let these well settled rules of construction be applied to the question under consideration. No special privilege or immunity can be claimed for a corporation by inference, implication or construction; if not conferred by *express words* in the charter, it cannot be exercised. The statute of 1804 contains no provision importing an express surrender of the taxing power, or expressly prohibiting the exercise of the power of amendment and repeal by any subsequent legislature. And such surrender of delegated authority is not to be derived from *implication* or *construction*. A mere legislative exemption, which would be at all times subject to alteration, cannot be construed into a surrender of the power of taxation in future, without enlarging the meaning of the language of the statute, so as to resolve, at least, all doubts and difficulties of construction in favor of the corporation, and against the public. Every surrender of the right to tax particular property, not only tends to paralyze the government, but involves a direct invasion of the rights of property of the balance of the community, by the necessary requirement of larger contributions from them to make up the deficiency. That a legislature, representing the whole people, and all interests, has deliberately attempted, without one dollar of compensation to the State, to surrender or relinquish a part of its functions of delegated sovereignty, in order to perpetuate inequality in the public burdens beyond the power of remedy, is not to be believed without clear and indubitable evidence. A legislative enactment, to show such want of fidelity to the public interests, and gross violation of public duty, if not usurpation of authority on the part of the legislature, must be such as to admit of no other rational interpretation.

The supreme court of Pennsylvania said, with great force, " that, if acts of incorporation are to be so construed as to make them imply grants of privileges, immunities, and exemptions, which are not expressly given, every company of adventurers may carry what they wish, without letting the legislature know their designs. Charters would be framed in doubtful or ambigu-

ous language, on purpose to deceive those who grant them; and laws which seem perfectly harmless on their face, and which plain men would suppose to mean no more than what they say, might be converted into engines of infinite mischief." 7 Harris Rep. 144. A surrender of the repealing power, therefore, even if feasible, could not be derived from implication or construction

II. My second position is, that, even conceding, *for the sake of the argument*, not simply the possibility, but the actual existence of a contract, embodied in the provisions of the law conferring the franchise and special immunities on the corporation, the recent legislation imposing a tax on the university lands, did not violate its conditions, or impair its obligations.

It has already been shown that every law, by its own inherent nature, *is subject to alteration or repeal* by the exercise of the legislative power of the State. This is one of the *inseparable incidents* or *inherent conditions* of every statutory enactment; and it results *necessarily* from the fact that the right of control over existing laws, by amendment or repeal, is an inherent and inseparable function of the legislative power, which is vested in the *general assembly as a continuing body*, and must remain in full force at every session. It is not within the competency of the legislature at one session, to surrender or abridge the authority which that body shall exercise at a subsequent session. If one legislature could, in the enactment of laws, provide, either by contract or the insertion of prohibitory clauses, against the alteration or repeal of its enactments by any future legislature, it could give a permanency to its laws equal to that of the constitution itself. The repeal of a law repeals, also, all its restraining and prohibitory provisions. 1 Wend. Black. 90; Broom's Legal Maxims 26; *Fletcher* v. *Peck*, 6 Cranch Rep. 87.

Besides this, it is worthy of remark, that this statute of 1804, conferring the franchise upon the corporation, not only contains *no clause providing against its alteration or repeal* by any subsequent legislature, but it does not prescribe any limit to the term or duration of the franchise. And, upon no established rule of interpretation, can a perpetuity in the special privileges and im-

munities of the corporation be derived from mere implication or construction. And further, the legislative interpretation of this statute is not to be overlooked, which is to be found in the actual legislative control exercised over it, by amendment from time to time since the first year after its enactment, by one of which amendments even the re-valuation provision, in the terms of the leases, was repealed without the consent of the corporation. This statute, therefore, upon every sound and reasonable view of it, must be subject to legislative control by amendment and repeal, as clearly as any other law on the statute book.

Now, if the charter of this corporation be *a contract*, according to the doctrine asserted, embracing the terms of the law, and comprehended within its provisions, it must, by its own inherent terms and conditions, *be subject to alteration and repeal.* The doctrine asserted is, not that the law authorizes a contract to be made, but that *the law itself*, conferring the franchise and immunities on the corporation, constitutes *the contract.* Where property is transferred, or private rights are acquired, by contract, made under the authority of a law, the private rights which attach as incidents to the property transferred, or the contract entered into, are unaffected by the subsequent repeal of the law authorizing them. But it cannot be maintained that a law conferring a franchise or immunity, or creating a public office, can be repealed, without abrogating the franchise, immunity, or office. For all that class of derivative rights unquestionably depend upon the continuance of the law for their existence. If this were not the case, the repeal or amendment of the law could not impair the obligations of the alleged contract; and there would be no pretense for the interposition of the power of the federal government, to declare the repealing law void on that account. But the whole doctrine that the charter of a corporation is a contract, hangs upon the point that the law conferring the franchise and immunities, contains the inherent terms of a contract on the part of the State, the obligations of which are impaired by an alteration or repeal of the law. If, therefore, the law conferring the franchise and immunities constitutes a contract, the inherent liability of the law to alteration or repeal, whenever the legislature

shall determine that the public interests require it, *is one of the essential conditions of the contract.* So that the alteration or repeal of the law, in the legitimate exercise of the legislative power, would be no violation of the obligations of the contract, if any such.existed. Thus those derivative private rights, which may be acquired in connection with the civil institutions of the State, must be held, like the rights of private property, subservient to the paramount and overruling considerations of the public interests. And if, by the alteration or repeal of any such law, any material damage should be done to private rights, for which compensation should in justice be made, it is sufficient to say, that *it is fully within the competency of the legislature to require it to be made.*

In the case of *The West River Bridge Co.* v. *Dix et al.,* 6 How. Rep., in which it was held by the Supreme Court of the United States, that the exercise of the right of *eminent domain* in no wise interferes with the inviolability of contracts, or of the right of private property, Mr. Justice Daniel, delivering the opinion of the court, said :

"Into all contracts, whether made between States and individuals, or between individuals only, there enter conditions which arise not out of the literal terms of the contract itself; they are superinduced by the pre-existing and higher authority of the laws of nature, of nations, or of the community to which the parties belong; they are always presumed, and must be presumed to be known and recognized by all, are binding upon all, and need never, therefore, be carried into express stipulation, for this could add nothing to their force. Every contract is made in subordination to them, and must yield to their control, as conditions inherent and paramount, wherever a necessity for their execution shall occur. Such a condition is the right of eminent domain. This right does not operate to impair the contract affected by it, but recognizes its obligation in the fullest extent, claiming only the fulfillment of an.essential and inseparable condition. Thus, in claiming the resumption or qualification of an investiture, it insists merely on the true nature and character of the right invested. The impairing of contracts inhibited by the constitution can scarcely *by the greatest violence of construction, be made applicable to the enforcing of the terms, or necessary import of a contract;* the language and meaning of the inhibition were designed to embrace proceedings attempting the interpolation of some new term or condition foreign to the original agreement, and, therefore, inconsistent with, and violative thereof."

The Supreme Court of the United States, in the case from which this extract is taken, held that the franchise of a corporation was

subject to the *incidental* and *implied condition*, that it was liable to be abrogated in the exercise of the right of eminent domain by the State; so that, even if it be a contract, this was one of its conditions. Now, I inquire, why does not the *legislative power* of *amendment and repeal* over the law conferring the franchise, rest upon the same ground. This power is as fully and distinctly delegated in the constitution as the *power of eminent domain;* and although the constitution of the State has fixed some restrictions upon the exercise of the latter, it has imposed none whatever upon the former. The exercise of each rests upon the determinations of the legislature as to the requirements of the public interests. The right of *eminent domain* is certainly not any more important and essential to the existence of government and the proper exercise of its powers, than either the right of taxation, or the right of legislative control over existing laws by amendment and repeal. These high functions of sovereignty are each inherent in every distinct political community, and essential to guard its existence, and to protect and promote the public interests. The exercise of these attributes of sovereignty relates not only to the external relations of government, but extends to the interior polity and business relations of life, and must be regulated with reference to the public interests and necessities of the whole community. And all private rights must be held as subordinate, and *upon the implied condition* of subjection, to the control of these indispensable functions of civil authority whenever the public necessities and interests require it.

Upon this ground Mr. Justice Catron well remarks, in *State Bank of Ohio* v. *Knoop,* 16 How. Rep. 400: " If the West River Bridge case be sound constitutional law (as I think it is), then it must be true, that the Supreme Court of Ohio is right in holding that the legislature of 1845 could not deprive the legislature of 1851 of its sovereign powers, or of any part of them."

It is said, however, that this argument is grounded on a subtlety, and heretofore unknown or unheard of in our courts. With all due deference, I inquire, is the early maxim of the law, *leges posteriores priores contrarias abrogant,* unknown in our courts? It was said by one of the sages of the common law, " *Non est*

*novum ut priores leges ad posteriores trahantur.*" And according to Broom's Legal Maxims, (marginal p. 24) it is an *elementary* and *necessary rule*, that a prior statute shall give place to a later one, where the intention to repeal is clear and unambiguous. Is the following doctrine of Blackstone grounded on a subtlety, and heretofore unknown in our courts ?

" Acts of parliament derogatory from the power of subsequent parliaments, *bind not.* Because the legislature being, in truth, the sovereign power, is always of equal, always of absolute authority ; it acknowledges no superior on earth, which the prior legislature must have been, if its ordinances could bind a subsequent parliament. And upon the same principle, Cicero, in his letters to Atticus, treats with a proper contempt those restraining clauses which endeavored to tie up the hands of succeeding legislatures. " *When you repeal the law itself,*" says he, " *you at the same time, repeal the prohibitory clause which guards against such repeal."* 1 Wend. Black. 90.

In *Fletcher* v. *Peck*, 6 Cranch Rep. 87, Chief Justice Marshall adverted to this subject in the following words :

" The principle asserted is, that one legislature is competent to repeal any act which a former legislature was competent to pass ; and that one legislature cannot abridge the powers of a succeeding legislature. The correctness of this principle, so far as it respects general legislation, can never be controverted."

We learn from the selection of legal maxims, by Broom, p. 24 :

" The legislature, which possesses the supreme power in the State, possesses, as incidental to that power, the right of changing, modifying, and abrogating the existing laws. To assert that any one parliament can bind a subsequent parliament by its ordinances, would in fact be to contradict the above plain proposition ; if, therefore, an act of parliament contains a clause, ' that it shall not be lawful for the King, by authority of parliament, during the space of seven years, to repeal and determine the same act,' such a clause, which is technically termed *clausula derogatoria,* will be simply void, and the act may, nevertheless, be repealed within the seven years, for *non impedit clausala derogatoria quo minus ab eadem protestate res dissolvantur a quibus constituentur.* And again, *perpetua lex est mullam legem humanam ac positivam perpetuam esse, et clausula quæ abrogationem excludit ab initio non valet.* . *The principle thus set forth seems to be of universal application."*

If, then, according to the maxims of the early sages of the law, even a statute which contains an express prohibition against

its alteration or repeal, may be changed or repealed, *a fortiori,* must a statute containing no *such prohibition,* rest upon the *incidental and implied condition* that it is subject to be altered or repealed by any subsequent legislature? And I may add, that a doctrine at variance with this, can have no permanent place in the laws of this country.

It has been said that, as the new constitution prohibits future grants of these perpetuities in exemptions from the sovereign authority of the State, the question in this case is comparatively unimportant. Is this a case for the application of the rule, *de minimis non curat lex?* It involves the question of a perpetuity in the exemption of two townships of land from all burden of taxation. And the same principle is applied to the leasehold estates in the extensive lands of the Miami University. And to what extent other lands, as well as personal property, may be claimed to be subject to similar exemptions, it is impossible to anticipate. The benefit of the perpetuity will doubtless be claimed to extend not only to millions, but hundreds of millions of dollars worth of property. And the principle asserted, gives immutability to all the other privileges and immunities of the innumerable corporations authorized under the former constitution of the State. And among the political changes going on, whether the friends of corporate supremacy may not be able to restore the provision of the former constitution, in this regard, cannot be foreseen. It is sufficient to say, that a microscopic view of the interest involved, is entitled to no consideration in the determination of a question involving a principle subversive of the very foundations of civil authority, and in derogation of the sovereign power of the State.

As to the alleged necessity for these perpetuities, in order to encourage enterprise, aid public improvements, and advance institutions of learning, experience in Ohio since 1851, in New York since 1824, and in other States of the union, as well as in England, where the franchises of corporations have ever been subject to the control of the legislative power, proves that it is wholly ideal.

Pressed by the force of argument and the light of truth, which

cannot be repelled, it is admitted, that if this were an original question, there would be no hesitation in adopting the position which I maintain. But it is argued, that the doctrine of the incompetency of the legislature to surrender any portion of the functions of sovereignty, or to provide by contract against the alteration or repeal of a law, is a new doctrine heretofore unheard of; and that the contrary doctrine, or irrepealability of charters, has been so long and so uniformly adopted and sanctioned by our courts, and understood and acted upon by all the departments of our government, that it has become a part of the constitution itself. This argument, as it seems to me, rests upon a most glaring and erroneous assumption. The maxim, *communis error facit jus*, is sometimes very consoling, in regard to a position unsustained by either principle or sound reason, but that rule has no application to the question before us : first, because this is a question of constitutional power ; and second, because there has been no such uniformity in the error as that claimed. The error was directly repudiated by this court, in 1852, without a dissenting opinion, and that decision was consistently maintained until the meeting of the court, at the present term. A decision overruling the settled law of this State for the last four or five years at least, and that, too, touching a question of constitutional power, cannot be bolstered by the rule that common error makes wrong right, and right wrong. Even in regard to a rule of practice, common error, in order to make law, must be not only of long continued, but of *universal* and *uninterrupted* acquiescence. Besides, the constitutional powers of the legislature cannot be altered by usage and practice. The doctrine that the continued exercise of unwarranted assumptions of power, confers authority, would sustain the divine right of kings, and the most despotic civil power ever used by tyrants.

Has the doctrine that the charter of a corporation is a contract, and that the legislature is competent to surrender the power of taxation, or the power of altering or repealing laws, been universally understood, acquiesced in, and acted on by all the departments of the government, as claimed ? It is an undeniable fact, that a part of the members of the legal profession in

this State have ever denied it. In 1838, when the question was directly made in the legislature, on the passage of the bank commission law, the doctrine was repudiated by the general assembly; and besides other instances, the same thing took place in the enactment of the bank tax law of 1851. And it is undeniable, that the people of the State, in the formation and adoption of the present constitution, imperatively requiring all investments in banking, and other property real and personal, to bear an equal burden of taxation, did directly repudiate this doctrine as to the surrender of the power of taxation at least. The Supreme Court of the United States was divided on this question in the case of *The Dartmouth College* v. *Woodward;* and it was understood, when the question was last made in that tribunal, that the doctrine was sustained by a bare majority of the court. And it has been insisted, with great plausibility, by members of the profession eminent for legal ability, that the effect of the decisions of the Supreme Court of the United States in *The Charleston Bridge* v. *Warren Bridge,* and *The West River Bridge Company* v. *Dix,* was to overrule, substantially, the doctrine claimed to be established in the Dartmouth College case.* It would be a most unwarranted assumption, therefore, to say that this doctrine has been settled by such long continued and universal acquiescence, as to become a part of the constitution itself, when it cannot be sustained by sound reason, is at variance with the elementary principles of Blackstone, and irreconcilable with the fundamental principles of our government, when it has ever been controverted by a large and respectable portion of the legal profession, and upon which both the judiciary and the legislative departments not only have been divided, but which they have, in numerous instances, substantially overruled or disregarded. When such an assumption can prevail, let the boast of the legal profession, that the object of the law is the ascertainment of truth, be abandoned.

The case of *The State of Ohio* v. *The Commercial Bank of Cincinnati,* 7 Ohio Rep. 125, has been referred to as sustaining

---

* See, at the end of this opinion, the note of the unanimous decision of the supreme court of Pennsylvania, overruling this doctrine.

the views expressed in the opinion of the majority of the court. With all proper deference, I must be permitted to say that, aside from the fact, that the decision of that case rests on reasons most unsatisfactory, the real constitutional question was neither raised nor decided.  Besides, the full review of this decision in *Bank of Toledo* v. *Bond*, 1 Ohio St. Rep. 679, to which I refer, the following extract from the able dissenting opinion of Mr. Justice Catron, in the case of *State Bank of Ohio* v. *Knoop*, 16 How. Rep. 400, is in point here :

"It is insisted, that the case of *The State of Ohio* v. *The Commercial Bank of Cincinnati*, 7 Ohio Rep., has held otherwise.  This is clearly a mistake.  The State, in that case, *raised no question as to the right of one legislature to cede the sovereign power to a corporation, and tie up the hands of all subsequent legislatures ;* no such constitutional question entered into the decision ; nor is any allusion made to it in the opinion of the court.  It merely construed the acts of assembly, and held that a contract did exist on the ground that, by the charter, the bank was taxed four per cent. on its profits ; and, therefore, the charter must be enforced, as this rate of taxation adhered to the charter, and excluded a higher imposition.

"It would be most unfortunate for any court, and especially for this one, to hold that *a decision affecting a great constitutional consideration, involving the harmony of the Union,* (as this case obviously does,) *should be concluded by a decision in a case where the constitutional question was not raised by counsel ; and so far from being considered by the court, was never thought of ; such a doctrine is altogether inadmissible.*"

And Mr. Justice Campbell, in his dissenting opinion in the same case, 16 How. Rep. 413, correctly speaks of the decision in the Commercial Bank Case, as follows :

"Nor can I consider the decision in 7 Ohio Rep. 125, of consequence in this discussion.  That case was decided upon a form of doctrine, which, after the judgment of this court, before cited, (*Providence Bank* v. *Billings*, 4 Pet. 514 ; *Charles River Bridge*, 11 Pet. 420 ;) had no title to any place in the legal judgment of the country.  The case was decided in advance of the most important and authoritative of those decisions.  It is not surprising to hear that the judges who gave the judgment, afterwards renounced its principle, or that another State court has disapproved of it, (7 Harris Penn. Rep. 144,) or that it has not been followed in kindred cases.  19 Ohio Rep. 110 ; 1 Ohio St. Rep. 563, 604, 626 ; and that the first time when it came up for revision it was overruled."

Of this case of the Commercial Bank it may be added, it was not a unanimous decision.  Of the four judges sitting in the case,

Judge Collett dissented, and Judge Wood afterwards publicly repudiated the doctrine of the decision. Besides, the subject of that decision was the construction to be given to the special statute incorporating the Commercial Bank, and it cannot settle the construction of another and different statute, enacted at a different time, and under different circumstances, and containing provisions essentially different, not only in language, but in their connection with other statutes in *pari materia.* And according to the decision in that case, the alleged contract rests upon the absurdity that the consideration paid by the bank for the valuable privileges conferred on it, is a compliance with the provision imposing the limitation on the taxing power of the State. It is conceded in the opinion, that in the absence of the provision of the charter for the payment of the tax of four per cent. on the dividends, the taxing power of the State, as to the property of the bank, would have been unrestrained by legislation. The provision, therefore, which is construed to be a *limitation* on the taxing power of the State in favor of the bank, is made the consideration accruing to the State, as the basis of the contract. When a decision, based on such reasoning, is recognized as set tling a general principle of law, the revered maxim, that law is the perfection of reason, should be blotted out from our law books.

The decision of the Supreme Court of the United States, in *Piqua Bank* v. *Knoop, Treasurer, etc.,* 16 How. Rep. 380, and several other recent adjudications of that tribunal, in relation to the bank tax in this State, have been referred to and relied on, in behalf of the plaintiff in the case before us. In regard to those cases, I have only to say : first, that they were made by a divided court ; and it must be humiliating to the pride of an American lawyer, who has examined the question involved, and read the dissenting opinions in those cases, to feel the necessity of citing them as authority ; and second, that those cases are in direct conflict with one of the clearest and and most unquestionable principles of law ever announced from the bench of the Supreme Court of the United States. If there be any thing well settled by direct adjudication, and repeated continued recognition, in the decisions of the Supreme Court of the United States, it is

this : that the judicial construction and interpretation given to the constitution and statutes of the several States, by their respective State courts, would be regarded as binding in the federal courts, and as the true exposition of the local law of each State. *Elmendorf* v. *Taylor et al.*, 10 Wheat. Rep. 152; *Coates' Executors* v. *Muse's Administrators*, Marshall's U. S. C. C. Rep. 543 ; Smith's Com. on Const. and Statutory Construction 746 ; *Green* v. *Neal*, 6 Pet. Rep. 291.   In the case first cited, Chief Justice Marshall used the following language :

" This court has uniformly professed its disposition, in cases depending on the laws of a particular State, to adopt the construction which the courts of the State have given to those laws.  This course is founded on the principle, supposed to be universally recognized, that the judicial department of every government, where such department exists, is the appropriate organ for construing the legislative acts of that government.  Thus no court in the universe which PROFESSES TO BE GOVERNED BY PRINCIPLE. would, we presume, undertake to say, that the courts of Great Britain, or of France, or of any other nation, had misunderstood their own statutes, and therefore, erect itself into a tribunal which should correct such misunderstanding.  We receive the construction given by the courts of the nation, as the true sense of the law, and feel ourselves no more at liberty to depart from that construction, than to depart from the words of the statute."

And in the case last cited, 6 Pet. Rep. 291, Mr. Justice McLean said :

" In a great majority of the causes brought before the federal tribunals, they are called to enforce the laws of the States.  The rights of parties are determined under those laws, and it would be a strange perversion of principle, if the judicial exposition of those laws, by the State tribunals, should be disregarded.  These expositions constitute the law, and fix the rule of property. Rights are acquired under this rule, and it regulates all the transactions which come within its scope.   *   *   *   *   *   *   *   *   *

" Would not a change in the construction of a law of the United States by this tribunal, be obligatory on the State courts ?  The statute, as last expounded, would be the law of the Union ; and why may not the same effect be given to the last exposition of a local law by the State court?  The exposition forms a part of the local laws, and is binding on all the people of the State. and its inferior judicial tribunals.  It is emphatically the law of the State ; which the federal court, while sitting within the State, and this court, when a case is brought before them, are called to enforce.  If the rule, as settled, should prove inconvenient or injurious to the public interest, the legislature of the State may modify the law, or repeal it.

"If the construction of the highest judicial tribunal of a State form a part of its statute laws, as much as an enactment by the legislature, how can this court make a distinction between them? There could be no hesitation in so modifying our decisions as to conform to any legislative alteration in a statute; and why should not the same rule apply where the judicial branch of the State government, in the exercise of its acknowledged functions, should, by construction, give a different effect to a statute from what had at first been given to it? The charge of inconsistency might be made with more force and propriety against the federal tribunals for a disregard of this rule, than by conforming to it. They profess to be bound by the local laws; and yet they reject the exposition of that law, which forms a part of it. It is no answer to this objection that a different exposition was formerly given to the act, which was adopted by the federal court. The inquiry is, what is the settled law of the State at the time the decision is made?"

Now, the whole question in the case of *The Piqua Bank* v. *Knoop*, as determined by the Supreme Court of the United States, was whether the sixtieth section of the bank law of this State, passed in 1845, constituted a contract; and that depended *on the construction* to be given to this provision of the State statute, and the provisions of the State constitution under which it was enacted. There was no question made as to the construction of the constitution of the United States. The sole question was as to the existence or non-existence of a contract. The tax law of 1851 had imposed a tax upon the property of the banks, equal to that imposed upon the property of individuals. The banks claimed that the sixtieth section of the bank law of 1845, which provided for the payment to the State of six per cent. on their neat profits, in lieu of all taxes, was a contract which exempted them from any change in the law as to the payment of taxes. The provision for the contribution by the banks was not in the ordinary form of a contract, and the law contained no provision expressly exempting it from alteration or repeal. Whether, therefore, the sixtieth section of. this law *constituted a contract*, and, *as such*, was exempt from the exercise of the legislative power to alter or repeal it, was a question of judicial interpretation and construction, arising under the constitution and statutes of the State. A contract had to be first found by the construction of the State law, before the question of the operation of the prohibitory clause of the constitution of the United States could

arise.   And the court of last resort in the State, after a most
elaborate and patient hearing, and upon the most deliberate con-
sideration, gave a construction to the State law, deciding that it
was a rule of taxation and not a contract.   And this was the
*first* and the *only* judicial construction ever given to this statute,
in this regard, by the Supreme Court of the State.   Yet the su-
preme federal tribunal, in the case of the Piqua Bank, and the
kindred cases, decided to overrule and reverse the decision of the
State court, where the simple and naked question was the judicial
construction of the local law of the State.   When it shall become
the settled law of this country, that it is the appropriate duty of
the Supreme Court of the United States to control as to the judi-
cial construction and interpretation of the local law of each State,
then, but not till then, should these decisions in the bank tax
cases be even entitled to notice as precedents.

Again, conceding, for the sake of the argument, the competency
of the legislature to surrender or abridge, by contract, the sovereign
powers delegated to the government, there is yet another view of
the subject, which is clearly fatal to the claim that the tax law
of 1852 violated the conditions, or impaired the obligations of the
supposed contract, on the part of the State.

Nothing in the jurisprudence of this country is better settled,
than that every contract, as to its validity, obligations, legal inci-
dents and effects, is to be governed by the law of the place where
made, compendiously expressed as the *lex loci contractus.*   Par-
ties are always presumed to contract in contemplation of the laws
of the place relative to the subject matter of the contract ; and
by the operation of those laws, in the language of Mr. Justice
Story, in his work on Promissory Notes, sec. 160, " the obliga-
tion may be limited in its operation or duration ; or it may be
revocable or dissoluble in certain future events, or under peculiar
circumstances."   Now, if a law conferring the franchise of a
corporation, or an exemption from taxation, be a contract, it must
be governed not only by the laws in force in reference thereto,
but also by the terms and regulations of the constitution of the
State, under the authority of which it was enacted ; so that the

provisions of the constitution must enter into the terms of the contract, and constitute conditions and incidents to its obligation. And if it be a contract for the surrender of civil authority, one of the necessary legal incidents of it must be, that the State may put an end to it, without violating the terms of its obligation, whenever the State can rightfully resume the authority thus surrendered.

Now, the constitution of 1802, under which the law incorporating the Ohio University was enacted, not only enjoined " a frequent recurrence to the *fundamental principles of civil government*, as absolutely necessary to preserve the blessings of liberty," and declared, as one of " the natural, inherent, and inalienable rights of the people, that they have *at all times a complete power to alter, reform*, or *abolish* their government, whenever they may deem it necessary ;" but also, in section 5 of article 7, provided *the mode and conditions* for the alteration and amendment of the constitution, in the following words :

" That after the year 1806, whenever two-thirds of the general assembly shall think it necessary to *amend* or *change this constitution*, they shall recommend to the electors, at the next election for members to the general assembly, to vote for or against a convention ; and if it shall appear that a majority of the citizens of the State, voting for representatives, have voted for a convention, the general assembly shall, at their next session, call a convention, to consist of as many members as there be in the general assembly ; to be chosen in the same manner, at the same place, and by the same electors that choose the general assembly; who shall meet within three months after the said election, for the purpose of revising, amending, or changing the constitution."

It appears, therefore, that the right of the people to resume their delegated powers, and to reform and change the fundamental law of the State, was thus expressly declared and provided for ; and this constituted one of the conditions of the obligation of the supposed contract.

In the exercise of the right declared, and in the particular mode prescribed, in the constitution, the people of the State changed their constitution, in 1851, requiring, in the new constitution, " *that laws should be passed, taxing, by a uniform rule, all real and personal property, according to its true value in*

*money.*" Pursuant to this provision of the constitution, the tax law of 1852 was enacted, imposing the tax complained of in this case.

I most respectfully insist, therefore, that, if the alleged contract existed, the terms and conditions of its obligation have not been violated. If there was a surrender of the power of taxation, it was upon *the terms and conditions expressed and declared in the constitution delegating the power,* and under the authority of which alone, the surrender could have been made, if made at all. And by the terms and conditions, and in the mode prescribed by that constitution, the power was resumed.

And even without this express constitutional provision, the right of the people of the State to resume their original powers of sovereignty, in changing and remodeling their government, being an inherent and inalienable right, it would exist as a necessary and unavoidable condition and incident in such contract, if any such existed.

In *Mumma* v. *The Potomac Company*, 8 Pet. Rep. 281, Mr. Justice Story, in delivering the opinion of the Supreme Court of the United States, speaking of the liability of corporations to dissolution, said : " Every creditor must be presumed to understand the nature and incidents of such a body politic, and to contract with reference to them. And it would be *a doctrine new in the law*, that the *existence of a private contract of a corporation* should force upon it a perpetuity of existence, *contrary to public policy*, and the nature and objects of its charter."

And the same learned judge, in delivering the opinion of the court, in *Terrett* v. *Taylor*, 9 Cranch 43, said : " *Upon a change of government, too, it may be admitted that such exclusive privileges, attached to a private corporation, as are inconsistent with the new government, may be abolished.*"

In *McCulloch* v. *Maryland*, 4 Wheat. Rep. 404, Chief Justice Marshall said : " It has been said, that the people had already surrendered all their powers to the State sovereignties, and had nothing more to give. *But, surely, the question whether they may resume and modify the powers granted to government, does not remain to be settled in this country.*"

The doctrine announced in the decision of this case, I must say, with all due deference, when pushed to its ultimate and inevitable results, not only violates that fundamental principle of all civil government, which places private rights upon the inherent and implied condition of liability of subjection to the public welfare when the public necessities require it; but it also makes the mere *adventitious* or *derivative private rights* arising from the civil institutions of the State, paramount not only to the constitution of the State from which they receive their authority, but paramount to the inalienable right inherent in every free people, to resume their original powers of sovereignty in order to alter, reform, or regenerate their government, when the general welfare, happiness, and safety of the people may require it.    And, by whatever abuse of civil authority such rights may be acquired, they are held, according to the doctrine of the opinion of the majority of the court, to be *unalterable and irrevocable.*    It matters not to what extent the State legislature may have been imposed on by greedy and unscrupulous adventurers holding monopolies and immunities from the State, the rights, once acquired, are beyond the reach of the legislative power of alteration or repeal.    It matters not by what sly and stealthy arts the over-reaching speculator upon the facility or corruption of the legislature may have obtained his privileges and exemptions, he is entitled to protection in the courts of justice, in the profits of his bargain ; for it is settled that courts cannot look to the corruption, the blindness, or mischievous effects of legislation, in determining its binding validity.    *Fletcher* v. *Peck,* 6 Cranch 87.    And it matters not to what extent the fundamental laws and institutions of the State may have been thus ignored, and the highest public interests made subservient to combinations of private corporations, the people of the State, even in the exercise of their inalienable right to alter, reform, abolish, and reconstruct their government, are wholly powerless, and must close their eyes to the abuses by which the high functions of their sovereignty have been stripped of their vitality and efficiency ; for, having assumed the form of contract, the abuses by which their powers have been surrendered, have become *irrevocable* and *unalterable.*

Thus has civil power been insidiously wrested from the hands of the people, in other ages and countries, *by a legal fiction.* For several centuries, the Roman emperors claimed the functions of imperial legislation upon a fiction propagated by the servility or ignorance of the civilians, who basked in the sunshine of the Roman and Byzantine courts. To the prayer of the ancient Cæsars, the people or the senate, as it is said, had occasionally granted a personal exemption from the obligations and penalties of particular statutes; and each indulgence was said to be an act of jurisdiction exercised by the republic over her citizens. And this humble privilege was at length transformed into a prerogative of imperial power, and the phrase, " released from the laws," was supposed to exalt the emperor above all human restraints, by the fiction of an *irrevocable grant* from the people. Thus the origin of imperial power, though false in fact, and slavish in its consequences, was supported on a simulated principle of freedom and justice.

Touching this same subject, as it arose under the British government, although in a form somewhat different, Sir William Davenant, a distinguished writer of the seventeenth century, said:

" No government or State can divest itself of the means of its own preservation; and if our kings should have had an unlimited power of giving away their whole revenue, and if no authority could have revoked such gifts, every profuse prince, of which we have had many in this kingdom, would have ruined his successor, and the people must have been destroyed with new and repeated taxes; for, by our duty, we are likewise to support the next prince. So that, if no authority could look into this, a nation must be utterly undone, without any way of redressing itself, which is against the nature and essence of any free establishment." Davenant's Works 244.

And in regard to the stringent precautionary measures which were adopted, and heavy responsibilities imposed for the preservation of the public revenues from spoliation and waste, in that country, this writer continues:

" The wickedness of men was either too cunning or too powerful for the wisdom of laws in being. And from time to time, great men, ministers, minions, favorites, have broken down the fences contrived and settled in our con-

stitution.  They have made a prey of the common wealth, plumed the prince, and converted to their own use what was intended for the service and preservation of the State.  That to obviate this mischief, the legislative authority has interposed with inquiries, accusations, and impeachments, till at last such dangerous heads were reached."  Davenant's Works 245.

Similar struggles were made in France, as it appears, to preserve the public revenues from spoliation.  And the national assembly in 1790, on this subject, declared, among other things, that : " All grants of the public rights, and especially those partaking of the nature of taxes, or subsidies, such as fines, confiscations, and stamps, were revoked, *because the subject was not alienable.*"   8 Merlin Rep., Tit. Dom. Pub. ; 1 Prond. Dom. Pub. 62.

If the power to set aside the improvident acts, and revoke the grants of the king, affecting the domain and patrimony of the crown, was reserved to the nation even under the monarchies of Europe, it would be extraordinary, indeed, if in the States of the American Union, where the people have been far more sparing in the delegation of civil power, and where their " *complete power* " to alter, reform, and re-construct their government has been so explicitly declared, *mere legislative grants,* tending to dilapidate and impoverish the public revenues, cannot be revoked or abrogated even by the people themselves, when the public interests require it.

This extended examination of the main question, in this case, is applicable to several other cases decided at the present term, in which the principle here discussed is involved.  And I have deemed it proper to discuss the question fully and in almost every point of view, in this case, because of the vast importance of the subject, and what, I have conceived to be, the enormities of the doctrine announced in the decision.

NOTE BY THE CHIEF JUSTICE.—Since the announcement of the decision in this case, I have been favored with a copy of the opinion of the supreme court of Pennsylvania, in the case of *Henry S. Mott et al. Canal Commissioners* v. *The Pennsylvania Railroad Company et al.,* just decided, in which that court has, by a unanimous decision, fully sustained the doctrine of the foregoing dissenting

opinion, and also repudiated the doctrine of the power of the Supreme Court of the United States to reverse the judgment of a State court, on the matter of the construction of a statute, or of the constitution of the State. And Chief Justice Lewis, in a very able opinion, pronouncing the judgment of the court, makes the following remarks, which I deem worthy of special note here :

" In general, the State courts have avoided expressing an opinion on this momentous question, where the necessities of the case did not require it. The cases which have arisen, have generally been disposed of by holding that, ' exemptions are binding until repealed by subsequent legislation ;' that ' no charter or grant carries with it such exemption unless clearly expressed ;' that ' the taxing power is of vital importance, and is essential to the existence of government ;' that it is ' a part of the power of legislation ;' that ' it resides in a government as a part of itself ;' and that ' the release of it is never to be assumed.' Most of these principles are announced by Chief Justice Marshall in the *Providence Bank* v. *Billings,* 4 Pet. 561, 562, 563, and recognized by many decisions in this and other States. 10 Barr. 442; 12 Harris 232; 10 Harris 496. But the question has been distinctly decided against the existence of any such power, five different times, by the unanimous judgment of all the judges of the Supreme Court of Ohio. *Deboll* v. *The Ohio Life Ins. and Trust Company,* 1 Ohio St. Rep. 563; *The Toledo Bank* v. *The City of Toledo,* Ib. 623 ; *Mechanics' and Traders' Branch Bank* v. *Debolt,* Ib. 591; *The Milan and Rushland Plank Road Company* v. *Husted,* 3 Ohio St. Rep. 578; *The Norwalk Plank Road Company* v. *Husted,* 3 Ohio St. Rep. 586. In one of these cases, it was declared that the legislature had not the constitutional authority to abridge or in any manner whatever surrender any portion of the right of taxation, and that this question had been settled by solemn adjudication, and is not now an open question in that State. 3 Ohio St. Rep. 581. It is true, that the Supreme Court of the United States has taken a different view of the question, and has, in several cases, reversed the decisions of the Supreme Court of Ohio. *Piqua Bank* v. *Knoop,* 16 How. 369 ; *Mechanics' and Traders' Bank* v. *Debolt,* 18 How. 380; *Mechanics' and Traders' Bank* v. *Thomas,* Ib. 384; *Dodge* v. *Woolsy,* Ib. 331.

" The decision of the Supreme Court of the United States, on the construction of the constitution or laws of the United States, are binding on the State courts. The decisions of the supreme courts of the several States, on the construction of the constitution and laws of their respective States, are, in like manner, binding on the Supreme Court of the United States. That court has no more right to overrule a judgment of a State court, on a question of State law, than the State court has to overrule the United States court on a question of United States law. All contracts are to be construed and understood according to the law of the place where they are made and to be performed. The laws and constitution of a State are to be construed and understood everywhere according to the judicial construction which they receive in the State where they are made and are to operate. This is the rule of jurisprudence which prevails universally throughout the civilized world. It is the rule which always ought to govern, and which generally does govern the Supreme Court of the United States. Wherever there is a departure from it, the necessary result is to impair public confidence in that exalted tribunal, and to introduce disastrous confusion into the administration of the law. It cannot be expected that the judges of the federal court should be as familiar with the constitution, laws and usages of Ohio, as the supreme judges of that State, who reside within her limits—who have been chosen on account of their acquaintance with her laws, and whose

especial business it is to expound them. The decision of the highest judicial tribunal in a State, on the construction of the State Constitution, or a State law, is authoritative everywhere, when the same question arises, because it is pronounced by the only tribunal having direct and immediate jurisdiction over the question. The decision of the United States court on the same point, where it incidentally arises, is not authority elsewhere, because it has no direct and immediate jurisdiction over the question. Its duty is to receive the State law as it is expounded in the tribunal of the last resort in the State. These views furnish a plain rule for estimating the value of the conflicting decisions which have been cited. We have no hesitation in adopting the decisions of the State courts, on all questions respecting the meaning of their own State constitutions, and extent of the powers which the people of the States have therein granted to the different departments of their own State governments. It may be added, that the United States court was divided in opinion on this question. Three eminent judges of that court dissenting, while the State court was unanimous. And it is but just to say, that the opinion of the State court is sustained by a course of argument which has never been satisfactorily answered in the United States courts, or elsewhere."


J. R. SWAN, J.

I concur with the judgment of the majority of the court in this case, but for reasons somewhat different from those stated by Justice Brinkerhoff.

There is nothing in the provisions of the constitution of 1851, nor in the laws passed in accordance with it, which would require any property to be taxed which had been previously exempted by express legislative stipulation or pledge of public faith.

For this reason, I do not think the university lands were liable to taxation.

In regard to the constitutional question made in this case: Inasmuch as the new constitution of Ohio provides against the legislature granting any privileges or immunities which may not be altered or repealed, the question before us has but little practical importance ; for our decision can only operate upon legislation before the constitution took effect.

Before the constitution of 1851, and from the first organization of the States of the Union, and their adoption of constitutions, down to the year 1851, the legislatures of different States, and among others the legislature of Ohio, by law, as in the case before us, undertook to exempt certain property, by special statute, from future taxation. These exemptions were generally

granted as inducements for citizens to vest their private property in public enterprises.  In the early struggles of new settlements, to open roads, build bridges, and support institutions of learning, neither private fortunes nor public revenues, could supply the urgent wants of the State.  Investments in these enterprises, while they furthered the prosperity of the country, were quite worthless as a source of private dividend to stockholders.  The State being without the necessary revenue to make appropriations of money, and capitalists not finding in them the sources of profit, these public enterprises depended, almost entirely, upon the public spirit and self-sacrifice of citizens who were willing to appropriate their private property to public uses, without any expectation of a profitable return in dividends.  The legislature, to encourage and induce this sacrifice, frequently stipulated in the acts incorporating turnpike, bridge, and other companies, that these public works should not be taxed.  The general assembly believed that these exemptions were obligatory upon the State.  The citizens of the State entertained the same belief, and embarked their private means on the faith of that belief.  From the time of the organization of the State, down to the year 1851, the question as to the power of the legislature to do this, was frequently brought before the Supreme Court of the United States, the courts of this State, and the courts of different States in the Union ; and it was determined that such exemption was within the constitutional power of the legislature.  *The State of Ohio* v. *Com. Bank Cin.*, 7 Ohio Rep. pt. 1,⅓125 ;  *The State of New Jersey* v. *Wilson*, 7 Cranch 164 ;  *Gordon* v. *Appeal Tax Court*, 3 How. 133 ;  *Osborn* v. *Humphrey*, 7 Conn. 335 ;  *The State of New Jersey* v. *Branin*, 2 Zabriskie 485 ;  *Phil. and Wil. Railroad* v. *Maryland*, 10 How. 393 ;  *Providence Bank* v. *Billings et al.*, 4 Pet. 514 ;  *State Bank of Ohio* v. *Knoop*, 16 How. 396.

Repeated legislation, the solemn adjudications of the courts, and public opinion, all concurred in holding that such exemption was a contract which the State could not violate.  Under these circumstances, and with these guaranties of public opinion, legislation, and the decisions of the highest tribunals of the country, and at a time, too, when the subject was not within the vortex of

party politics, citizens were induced to vest their private means in public enterprises ; and, as in the case now before this court, to enter into contracts which they are not permitted to violate, based upon, and in fact, in many cases, paying an equivalent for, an exemption from taxation.

If there be any cases in which a court should adhere to previous adjudications, it is in my opinion those which have induced the principal department of the government to enact laws under which, and upon the faith of which the people have acted, and vested their property.

The recognition of the power of the legislature to violate the plighted faith of the State, could be of no practical importance whatever, unless the legislature exercised the power. The moral difference between the abstract recognition of a constitutional power, and the exercise of that power, is too obvious to need remark ; and it is perhaps unnecessary to add, that there is no citizen so lost to a sense of State pride and common honesty, as to desire his representative to dishonor him and the State, by a violation of the plighted good faith of the State. Upon this subject, none of the members of this court, or of any other court, could entertain a difference of opinion.

If, however, courts recognize this power in the legislature, they must necessarily sanction its exercise.

Now, as a mere abstract principle and logical deduction growing out of the nature of the legislative power of taxation, it would have accorded with my own views of constitutional law, for courts and legislative bodies to have adopted, originally, as a constitutional rule, the principle that one general assembly could not, by contract or otherwise, exempt property from taxation, so as to restrain a subsequent legislature from making an assessment upon the same property.

If so originally held by courts and legislatures, those who were to be affected by the exercise of legislative violation of pledges and stipulations, would at least have known from the beginning, the hazards upon which they embarked their property, and that they had nothing to rely upon but the good faith of the State.

But it was not so originally held. It was held otherwise, by

the courts of this State, until 1853, when judicial interpretation clothed the legislature with this new constitutional power. The court of Pennsylvania have since adopted the logical deductions of our judges upon this question.

I concede the force of these logical deductions; but they do not justify an alteration of an established constitutional rule, repeatedly declared by courts, settled by the practice and interpretation of legislatures; and under which, and upon the belief of its inviolability, citizens have for fifty years vested their property and entered into contracts.

In this view, the decision of this court in *Bingham* v. *Miller*, 17 Ohio Rep. 445, is directly applicable. In that case, the court held, that although they were of the opinion that the legislature had no constitutional power to grant a divorce, yet the power had been so long exercised by the legislature, that the court felt constrained to sanction it.

A court which alters settled constitutional rules, is engaged in the appropriate duties of a constitutional convention; but when, in so doing, the court sanctions and permits the exercise of a new legislative power, whereby public faith may be violated, it may, indeed, improve the constitution; but it may be also inviting the legislature to sacrifice a still more important element in the happiness and prosperity of a people—its public morals and unsullied public honor.